XAVIER BECERRA
Attorney General of California
DAVID A. ZONANA, State Bar No. 196029
Supervising Deputy Attorney General
GEORGE TORGUN, State Bar No. 222085
MARY S. THARIN, State Bar No. 293335
Deputy Attorneys General
 1515 Clay Street, 20th Floor
 P.O. Box 70550
 Oakland, CA  94612-0550
 Telephone:  (510) 879-1002
 Fax:  (510) 622-2270
 Email:  George.Torgun@doj.ca.gov

*Attorneys for Plaintiff State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA,** by and through **XAVIER BECERRA, ATTORNEY GENERAL,**<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES BUREAU OF LAND MANAGEMENT; JOSEPH BALASH,** Assistant Secretary for Land and Minerals Management, United States Department of the Interior; and **RYAN ZINKE,** Secretary of the Interior,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(Administrative Procedure Act,<br>5 U.S.C. § 551 *et seq*.) |

**INTRODUCTION**

1. Plaintiff State of California, by and through Xavier Becerra, Attorney General ("Plaintiff" or "California") brings this action to challenge the decision by the U.S. Bureau of Land Management, *et al*. ("BLM" or "Defendants") to repeal its 2015 regulations governing the practice of hydraulic fracturing on federal and Indian lands (the "Fracking Rule"). The Fracking Rule filled a rapidly expanding regulatory gap that resulted from BLM's failure to address the significant public health and environmental consequences stemming from hydraulic fracturing, a

1  practice that has dramatically increased in recent years in the development of oil and gas
2  resources.  By repealing the Fracking Rule in its entirety, Defendants have tossed aside the public
3  interest in ensuring that fossil fuel development is conducted in an environmentally sound and
4  safe manner in service of what their own data shows is a negligible increase in oil and gas
5  operators' profits.  Their action is devoid of any reasoned analysis, contravenes BLM's statutory
6  mandates, and ignores significant environmental consequences, in violation of the Administrative
7  Procedure Act ("APA"), several federal land management statutes, and the National
8  Environmental Policy Act ("NEPA").
9      2.   BLM, a division of the U.S. Department of the Interior ("DOI"), finalized the "Oil
10 and Gas; Hydraulic Fracturing on Federal and Indian Lands" rule on March 29, 2015, after
11 conducting a multi-year stakeholder process and reviewing over a million public comments.  80
12 Fed. Reg. 16,128 (Mar. 29, 2015).  The primary goals of the Fracking Rule were to ensure that oil
13 and gas wells subject to the extreme pressures of hydraulic fracturing were properly constructed
14 to protect underground drinking water aquifers, to make certain that the high volume of fracking
15 and drilling fluids that flow back to the surface from each fracked well were managed in an
16 environmentally responsible way, and to provide public disclosure of the chemicals used in
17 hydraulic fracturing fluids.  *Id*.  As BLM modestly stated at that time, the Fracking Rule "serves
18 as a much-needed complement to existing regulations designed to ensure the environmentally
19 responsible development of oil and gas resources on Federal and Indian lands, which were
20 finalized nearly thirty years ago, in light of the increasing use and complexity of hydraulic
21 fracturing coupled with advanced horizontal drilling technology."  *Id*.
22     3.   On March 28, 2017, President Donald Trump issued Executive Order 13783
23 entitled "Promoting Energy Independence and Economic Growth."  82 Fed. Reg. 16,093 (Mar.
24 31, 2017).  Section 7 of that Executive Order, entitled "Review of Regulations Related to United
25 States Oil and Gas Development," specifically called on the Secretary of the Interior to review
26 and "as soon as practicable, suspend, revise, or rescind" the Fracking Rule.  Just a day later,
27 Secretary of the Interior Ryan Zinke issued Secretarial Order 3349 entitled "American Energy
28 Independence," which claims to implement Executive Order 13783.  Section 5(c)(i) of the

Secretarial Order provided, without any justification or analysis, that "BLM shall proceed expeditiously with proposing to rescind" the Fracking Rule.

4.   BLM issued its proposal to repeal the Fracking Rule on July 25, 2017.  82 Fed. Reg. 34,464 (Jul. 25, 2017) ("Proposed Repeal").  Citing to Executive Order 13783 and Secretarial Order 3349, BLM claimed that the Fracking Rule "unnecessarily burdens industry with compliance costs and information requirements that are duplicative of regulatory programs of many states and some tribes." *Id*. at 34,464-65.  Along with the Proposed Repeal, BLM issued an Environmental Assessment finding no significant environmental impacts associated with the repeal of the Fracking Rule.  BLM also issued a Regulatory Impact Analysis finding that compliance with the Fracking Rule would cost approximately $9,690 per well, or about 0.1-0.2% of the cost of drilling a well (almost $2,000 less than BLM's cost estimate when it adopted the Fracking Rule in 2015).

5.   On December 29, 2017, BLM issued its final rule repealing the Fracking Rule.  82 Fed. Reg. 61,924 (Dec. 29, 2017) ("Final Repeal").  However, BLM's action is arbitrary and capricious because the agency attempts to rescind a duly promulgated rule without supplying a reasoned basis for doing so.  In particular, BLM failed to consider how the Final Repeal would fulfill the important statutory mandates that the Fracking Rule was designed to address, failed to explain why it reversed course based on the same information that it considered when it formulated and promulgated the Rule just two years earlier, and offered a purported justification for the Final Repeal that runs counter to the evidence before the agency.  The Final Repeal also violates Defendants' statutory mandates to ensure the environmentally responsible development of oil and gas resources on Federal and Indian lands, to fulfill its responsibility as trustee for Indian lands, to protect the interests of the United States, and to safeguard the public welfare.  Furthermore, BLM's perfunctory conclusion that the Final Repeal would result in no significant environmental impacts violates the requirements of NEPA.

6.   Accordingly, Plaintiff seeks a declaration that BLM's action violated the APA, NEPA, and multiple federal land management statutes, and an injunction requiring BLM to vacate the Final Repeal and immediately reinstate all of the Fracking Rule's provisions.

Complaint for Declaratory and Injunctive Relief

## JURISDICTION AND VENUE

7. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States), 28 U.S.C. § 1361 (action to compel officer or agency to perform duty owed to Plaintiff), and 5 U.S.C. §§ 701–706 (Administrative Procedure Act). An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 705–706.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because this is the judicial district in which Plaintiff State of California resides, and this action seeks relief against federal agencies and officials acting in their official capacities.

## INTRADISTRICT ASSIGNMENT

9. Pursuant to Civil Local Rules 3-5(b) and 3-2(c), there is no basis for assignment of this action to any particular location or division of this Court.

## PARTIES

10. Plaintiff, STATE OF CALIFORNIA, brings this action by and through Attorney General Xavier Becerra. The Attorney General is the chief law enforcement officer of the State and has the authority to file civil actions in order to protect public rights and interests, including actions to protect the natural resources of the State. Cal. Const., art. V, § 13; Cal. Gov. Code §§ 12600-12612. This challenge is brought in part pursuant to the Attorney General's independent constitutional, statutory, and common law authority to represent the public interest.

11. California contains millions of acres of federal and tribal lands that are managed by Defendants for energy production. In particular, BLM oversees 15 million acres of public lands (about 15% of the Golden State's total land mass) and 47 million acres of subsurface mineral estate. These lands contain approximately 600 producing oil and gas leases covering more than 200,000 acres and 7,900 usable oil and gas wells. California is a leading state in terms of oil extraction on public lands—producing about 15 million barrels annually—and also produces approximately 7 billion cubic feet of natural gas annually. Considering onshore BLM-administered leases nationwide, California is the third largest oil producer and the 13th highest

Complaint for Declaratory and Injunctive Relief

natural gas producing state. California also has the sixth highest number of fracked wells on federal lands of any state.

12. California has a strong interest in preventing the adverse environmental and public health impacts from the use of hydraulic fracturing on federal and Indian lands within the State. In July 2015, the California Division of Oil, Gas, and Geothermal Resources ("DOGGR") certified an environmental impact report which found that well stimulation treatments including hydraulic fracturing, depending on site-specific conditions and the intensity of well stimulation activities, may have the potential to cause significant and unavoidable impacts to aesthetics, air quality, biological resources (terrestrial environment), cultural resources, geology, soils and mineral resources, greenhouse gas emissions, land use and planning, public and worker safety, and transportation and traffic. For example, DOGGR's analysis found that in Kern County, the air emissions resulting from fracking operations "would occur at levels that could violate an air quality standard or contribute substantially to an existing or projected air quality violation." DOGGR also found that "[w]ell-stimulation activities could affect endangered, rare, or threatened species of fish, wildlife or plants," and mitigation would be required to "avoid hazards such as vehicle strikes, nest disturbance, entrapment, collision, electrocution, and hazardous materials." The California Council on Science and Technology also released a study in July 2015 which identified several potential direct and indirect impacts from hydraulic fracturing, including the release of volatile organic compounds ("VOCs") from retention ponds and tanks used to store well stimulation fluids, and induced seismicity (i.e., earthquakes) from the disposal of wastewater in disposal wells.

13. In 2013, California enacted Senate Bill 4 (Pavley, Ch. 313. Stats. of 2013), which set up a regulatory process for well stimulation treatments (including hydraulic fracturing) in California, and required DOGGR to issue final regulations by July 1, 2015 governing these activities. DOGGR's regulations largely mirror those in the Fracking Rule, although the Fracking Rule contains some provisions, such as the requirement to perform a mechanical integrity test prior to recommencing a well stimulation treatment following an anomalous pressure increase, that are not included in the DOGGR regulations. Moreover, because both state and federal

regulations apply on federal lands in California, the Fracking Rule provides an additional federal layer of regulation and enforcement that addresses the environmental and public health concerns related to hydraulic fracturing.

14. Moreover, the requirements in other states or tribes on many issues related to hydraulic fracturing, including obtaining permits for hydraulic fracturing operations, mechanical integrity testing, monitoring during fracking operations, well casing and cementing, baseline water testing, and disclosure rules, are weaker or nonexistent. Given these varying requirements, rescinding a rule that applies on federal and Indian lands nationwide creates an unlevel playing field for oil and gas development. In addition, Plaintiff has an interest in the protection of federal lands, which belong to the People.

15. By repealing the requirements of the Fracking Rule, Defendants' action will adversely impact Plaintiff by increasing the potential for harmful environmental and public health impacts from the use of hydraulic fracturing on federal and Indian lands, including increased air pollution, impacts to surface and groundwater resources, and induced seismicity from the disposal of wastewater in disposal wells from hydraulic fracturing operations. Consequently, Plaintiff has suffered a legal wrong as a result of Defendants' action and has standing to bring this suit.

16. Defendant UNITED STATES BUREAU OF LAND MANAGEMENT is an agency within the United States Department of the Interior that is charged with managing the federal onshore oil and gas program and bears responsibility, in whole or in part, for the acts complained of in this Complaint.

17. Defendant JOSEPH BALASH is the Assistant Secretary for Land and Minerals Management, United States Department of the Interior, and is sued in his official capacity. Mr. Balash signed the Final Repeal at issue and bears responsibility, in whole or in part, for the acts complained of in this Complaint.

18. Defendant RYAN ZINKE is the Secretary of the United States Department of the Interior, and is sued in his official capacity. Mr. Zinke has responsibility for implementing and fulfilling the duties of the United States Department of the Interior, including the development of

fossil fuel resources on public lands, and bears responsibility, in whole or in part, for the acts complained of in this Complaint.

**STATUTORY BACKGROUND**

**I.     Federal Land Management Statutes.**

19.    Defendants' duty to regulate hydraulic fracturing on federal and Indian lands is established by several federal land management statutes.  First, the Mineral Leasing Act of 1920, 30 U.S.C. § 181 *et seq*. (the "MLA"), directs BLM to "prescribe necessary and proper rules and regulations" to ensure that operations on federal leases are conducted with "reasonable diligence, skill and care," to protect "the interests of the United States," and to safeguard "the public welfare" in federal mineral leases.  30 U.S.C. §§ 187, 189.

20.    The Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq*., requires BLM to regulate "the use, occupancy, and development of the public lands" under the principles of "multiple use and sustained yield."  *Id*. § 1732.  Among other requirements, FLPMA mandates that BLM manage public lands "in a manner that will protect the quality of … ecological, environmental, air and atmospheric, [and] water resource … values," *id*. § 1701(a)(8), and that BLM "by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands."  *Id*. § 1732(b).

21.    Pursuant to the Indian Mineral Leasing Act of 1938, 25 U.S.C. §§ 396a–396g, and the Indian Mineral Development Act of 1982, 25 U.S.C. §§ 2101–08, BLM regulates oil and gas development on 56 million acres of Indian mineral estate held in trust by the federal government.  *See, e.g.*, 25 U.S.C. § 396d (oil and gas operations on Indian lands subject "to the rules and regulations promulgated by the Secretary").

**II.    National Environmental Policy Act.**

22.    The National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.,* is the "basic national charter for the protection of the environment."  40 C.F.R. § 1500.1.  The fundamental purposes of the statute are to ensure that "environmental information is available to public officials and citizens before decisions are made and before actions are taken," and that "public

7

1    officials make decisions that are based on understanding of environmental consequences, and take
2    actions that protect, restore, and enhance the environment." *Id*. § 1500.1(b)-(c).

3        23.   To achieve these purposes, NEPA requires the preparation of a detailed
environmental impact statement ("EIS") for any "major federal action significantly affecting the
quality of the human environment." 42 U.S.C. § 4332(2)(C). As a preliminary step, an agency
may first prepare an environmental assessment ("EA") to determine whether the effects of an
action may be significant. 40 C.F.R. § 1508.9. If an agency decides not to prepare an EIS, it
must supply a "convincing statement of reasons" to explain why a project's impacts are
insignificant. *Nat'l Parks & Conservation Ass'n v. Babbitt,* 241 F.3d 722, 730 (9th Cir. 2001).
However, an EIS must be prepared if "substantial questions are raised as to whether a project ...
may cause significant degradation of some human environmental factor." *Idaho Sporting
Congress v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998).

    24.   To determine whether a proposed project may significantly affect the environment,
NEPA requires that both the context and the intensity of an action be considered. 40 C.F.R. §
1508.27. In evaluating the context, "[s]ignificance varies with the setting of the proposed action"
and includes an examination of "the affected region, the affected interests, and the locality." *Id*. §
1508.27(a). Intensity "refers to the severity of impact," and NEPA's implementing regulations
list ten factors to be considered in evaluating intensity, including "[u]nique characteristics of the
geographic area such as proximity to ... ecologically critical areas," "[t]he degree to which the
effects on the quality of the human environment are likely to be highly controversial," "[t]he
degree to which the possible effects on the human environment are highly uncertain or involve
unique or unknown risks," and "[t]he degree to which the action may establish a precedent for
future actions with significant effects or represents a decision in principle about a future
consideration." *Id*. § 1508.27(b). The presence of just "one of these factors may be sufficient to
require the preparation of an EIS in appropriate circumstances." *Ocean Advocates v. U.S. Army
Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005).

### III. The Administrative Procedure Act.

25. The Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, governs the procedural requirements for agency decision-making, including the agency rule making process. Under the APA, a "reviewing court shall … hold unlawful and set aside" agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. If an agency reverses course by suspending a fully-promulgated regulation, it is "obligated to supply a reasoned analysis for the change." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 42 (1983). Further, an agency must show that "there are good reasons" for the reversal. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). An agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate" when "its new policy rests upon factual findings that contradict those which underlay its prior policy." *Id.* Moreover, an agency cannot suspend a validly promulgated rule without first "pursu[ing] available alternatives that might have corrected the deficiencies in the program which the agency relied upon to justify the suspension." *Public Citizen v. Steed*, 733 F.2d 93, 103 (D.C. Cir. 1984).

### FACTUAL AND PROCEDURAL BACKGROUND

26. In recent years, several areas of the United States have experienced a boom in oil and gas production through the use of advanced well treatments such as fracking. Fracking is a procedure by which oil and gas producers inject water, sand, and certain chemicals at high pressure into tight-rock formations (typically shale) to create fissures in the rock and allow oil and gas to escape for collection in a well. A typical fracking operation involves the underground injection of hundreds of thousands to several million gallons of fluid. While most of the fluid is water, an assortment of chemicals, some of which are known carcinogens or other types of toxins, are added for different purposes such as lubrication of the fracture and minimization of corrosion. Much of the fracturing fluid, along with subsurface fluids (which often contains hazardous heavy metals and other contaminants from the shale formation), flows back to the surface and is typically disposed of by subsequent injection into underground wells.

Complaint for Declaratory and Injunctive Relief

27. The rapid expansion of fracking nationwide has led to growing public concern about the risks of water and air pollution, increased seismic activity, and a prolonged dependence on fossil fuels. *See* 80 Fed. Reg. at 16,128, 16,182-83. For example, inadequate steel and cement well casings that run through groundwater zones can break during fracking operations and allow fracking fluids to escape. Air pollution concerns arise from the handling of the flow back fluids, which if stored in open pits may allow for the evaporation of toxic chemicals. Lastly, some areas of heavy fracking operations have seen a pronounced increase in the frequency of low-level seismic events.

28. BLM is the agency responsible for overseeing oil and gas development on over 245 million acres of public lands and 700 million acres of subsurface mineral estate across the United States. BLM has estimated that ninety percent of new wells drilled on federal lands are now being stimulated using fracking. 80 Fed. Reg. at 16,131. The vast majority of fracking on federal lands occurs in just nine states, including California. *Id.* at 16,187.

29. In response to increased concern about the public health and environmental impacts of fracking, BLM began a rulemaking process in 2010 to provide additional regulatory oversight over the practice and released its first proposed rule in 2012. 77 Fed. Reg. 27,691 (May 11, 2012). Following another comment period where it received over 1.35 million comments, *see* 78 Fed. Reg. 31,636 (May 24, 2013), BLM released its final Fracking Rule on March 26, 2015. 80 Fed. Reg. 16,128.

30. According to BLM, the Fracking Rule "serves as a much-needed complement to existing regulations designed to ensure the environmentally responsible development of oil and gas resources on Federal and Indian lands, which were finalized nearly thirty years ago, in light of the increasing use and complexity of hydraulic fracturing coupled with advanced horizontal drilling technology." *Id*. The Fracking Rule "is more protective than the previous proposed rules and current regulations," "strengthens oversight and provides the public with more information than is currently available, while recognizing state and tribal authorities and not imposing undue delays, costs, and procedures on operators." *Id*.

Complaint for Declaratory and Injunctive Relief

31.     According to BLM, the primary goals of the Fracking Rule were to "ensure that wells are properly constructed to protect water supplies, to make certain that the fluids that flow back to the surface as a result of hydraulic fracturing operations are managed in an environmentally responsible way, and to provide public disclosure of the chemicals used in hydraulic fracturing fluids." *Id*. The Fracking Rule requires operators to provide detailed information on designs, plans, and geology before commencing fracking. It specifies performance and design standards and requires monitoring and testing to ensure wellbore integrity. It fills a regulatory gap by providing requirements for temporary storage of recovered fluids. And it requires post-operation filing of information relating to the fracking operation, including public disclosure of fracking fluids composition.

32.     At the time it was issued, BLM stated that the Fracking Rule would provide numerous public health and environmental benefits because it was more protective than existing state and tribal regulations. For example, of the nine states where the majority of fracking on federal land occurs, at least six did not require the use of tanks instead of pits for containing waste fluids. *See* 80 Fed. Reg. at 16,162-63. BLM's requirements for operators to submit an application and specific information prior to receiving authority to frack also went beyond what most states required, and BLM determined that this process was "necessary" to "mitigate potential impacts." *Id*. at 16,147. Also, most states lacked regulations to address "frack hits," a term for a fracking operation that causes an unplanned surge of pressurized fluid into another well, often resulting in surface spills. *Id*. at 16,181-82. Moreover, the Fracking Rule contemplated concurrent state regulation of wells on federal lands and in no way prevented states from enacting stricter requirements. BLM estimated that compliance with the Fracking Rule was expected to cost about $11,400 per well, or approximately 0.13 to 0.21 percent of the cost of drilling a well (an estimate that BLM has since lowered in its Final Repeal), but noted that such costs may be overstated to the extent that the Fracking Rule's provisions are already required by state regulations or are consistent with the voluntary practice of operators. *Id.* at 16,130.

33.     Despite the existence of state requirements, BLM explained in 2015 that "a major impetus for a separate BLM rule is that states are not legally required to meet the stewardship

11

standards that apply to public lands and do not have trust responsibilities for Indian lands under Federal laws." 80 Fed. Reg. at 16,133; *see id*. at 16,154 (the Fracking Rule is "necessary to enable the BLM to meet its statutory obligations to regulate operations associated with Federal and Indian oil and gas leases; prevent unnecessary or undue degradation; and manage public lands using the principles of multiple use and sustained yield; and protect resources associated with Indian lands.").

34. Shortly after the Fracking Rule was finalized, two industry groups, the states of Wyoming, Colorado, North Dakota, and Utah, and the Ute Indian Tribe (collectively, "Petitioners") filed or intervened in lawsuits challenging the Rule in Federal District Court in Wyoming. *See Independent Petroleum Association of America, et al. v. Jewell. et al.*, Case No. 2:15-CV-041-SWS (D. Wyo. petition filed Mar. 20, 2015); *State of Wyoming, et al. v. U.S. Dept. of the Interior, et al.*, Case No. 2:15-CV-043-SWS (D. Wyo. petition filed Mar. 26, 2015). Petitioners argued that BLM lacked the statutory authority to regulate fracking on federal and Indian lands, and the District Court agreed in a merits decision issued on June 21, 2016, and set aside the Fracking Rule. Appeals of this decision were taken by BLM and environmental intervenors to the Tenth Circuit Court of Appeals, where the appeal remained pending during the developments discussed below.

35. On March 28, 2017, President Donald Trump issued Executive Order 13783 entitled "Promoting Energy Independence and Economic Growth." 82 Fed. Reg. 16,093 (Mar. 31, 2017). Section 7 of that Executive Order, entitled "Review of Regulations Related to United States Oil and Gas Development," specifically called on the Secretary of the Interior to review "for consistency with the policy set forth in section 1 of this order and, if appropriate," and "as soon as practicable … publish for notice and comment proposed rules suspending, revising, or rescinding" the Fracking Rule.

36. The next day, Secretary of the Interior Ryan Zinke issued Secretarial Order 3349 entitled "American Energy Independence," which claims to implement Executive Order 13783. Section 5(c)(i) of the Secretarial Order provided that "BLM shall proceed expeditiously with

Complaint for Declaratory and Injunctive Relief

1   proposing to rescind the final rule entitled, 'Oil and Gas; Hydraulic Fracturing on Federal and
2   Indian Lands,' 80 Fed. Reg. 16128 (Mar. 26, 2015)."

3   37.   BLM issued its Proposed Repeal on July 25, 2017.  82 Fed. Reg. 34,464.  Citing to
4   Executive Order 13783 and Secretarial Order 3349, BLM stated that the Rule "unnecessarily
5   burdens industry with compliance costs and information requirements that are duplicative of
6   regulatory programs of many states and some tribes." *Id*. at 34,464-65.  Along with the Proposed
7   Repeal, BLM issued a Regulatory Impact Analysis finding that compliance with the Rule would
8   cost approximately $9,690 per well, or about 0.1-0.2% of the cost of drilling a well.  In addition,
9   BLM released a draft Environmental Assessment finding no significant environmental impacts
10  associated with the repeal of the Fracking Rule.  On September 25, 2017, the State of California,
11  by and through Attorney General Xavier Becerra, submitted comments in opposition to the
12  Proposed Repeal.

13  38.   On September 21, 2017, following the issuance of BLM's Proposed Repeal, the
14  Tenth Circuit Court of Appeals dismissed the appeals of the District Court's decision as
15  prudentially unripe and vacated the District Court's June 21, 2016 judgment invalidating the
16  Fracking Rule.  *See State of Wyoming v. Zinke*, 871 F.3d 1133 (10th Cir. 2017).

17  39.   On December 29, 2017, BLM published the Final Repeal in the Federal Register.  82
18  Fed. Reg. 61,924.  Citing to Executive Order 13783 and Secretarial Order 3349, BLM's primary
19  justification is that the Final Repeal "is needed to prevent the unnecessarily burdensome and
20  unjustified administrative requirements and compliance costs of the 2015 rule from encumbering
21  oil and gas development on Federal and Indian lands." *Id*. at 61,924-25.  Moreover, BLM states
22  that "[t]his Administration's policy is to increase revenues and to reduce reliance on imported oil
23  through this and other actions to reduce unnecessary burdens on energy industries, including oil
24  and gas on Federal and Indian lands.  Thus, we are rescinding the 2015 rule." *Id*. at 61,944.

25  40.   Acknowledging that the Fracking Rule provided "additional assurance that operators
26  are conducting hydraulic fracturing operations in an environmentally sound and safe manner, and
27  increase[d] the public's awareness and understanding of these operations," BLM claims in the
28  Final Repeal that since promulgation of the 2015 Fracking Rule, "an additional 12 states have

introduced laws or regulations addressing hydraulic fracturing," and "some tribes with oil and gas resources have also taken steps to regulate oil and gas operations, including hydraulic fracturing, on their lands." *Id*. at 61,924-25. BLM also cites "several pre-existing regulations" and "discretionary authority allowing it to impose site-specific protective measures" that will allegedly enable it to reduce the risks associated with hydraulic fracturing. *Id*. at 61,926. Furthermore, BLM claims that a review of incident reports from federal and Indian wells since December 2014 "indicated that resource damage is unlikely to increase by rescinding the 2015 final rule because of the rarity of adverse environmental impacts that occurred from hydraulic fracturing operations since promulgation of the 2015 rule." *Id*. Thus, "BLM now believes that the appropriate framework for mitigating these impacts exists through state regulations, through tribal exercise of sovereignty, and through BLM's own pre-existing regulations and authorities." *Id*.

41. On January 3, 2018, BLM released a "Regulatory Impact Analysis for the Final Rule to Rescind the 2015 Hydraulic Fracturing Rule" ("Final RIA"). The Final RIA estimated that the Final Repeal "would reduce compliance costs by up to about $9,690 per well," which "represents about 0.1 – 0.2% of the costs of drilling a well." Final RIA at 4, 53-54. This reduction "would be just a small fraction of a percent of the profit margin for small companies, which is not a large enough impact to be considered significant." *Id.* at 62. The Final RIA also stated that the Final Repeal "is unlikely to substantially alter the investment decision of firms and is unlikely to affect the supply, distribution, or use of energy." *Id.* at 59.

42. On January 3, 2018, BLM also released a final "Environmental Assessment, Rescinding the 2015 Hydraulic Fracturing on Federal and Indian Lands Rule" ("Final EA") as well as a "Finding of No Significant Impact" ("FONSI"). The Final EA and FONSI contain only a brief discussion of a few of the impacts of repealing the Fracking Rule related to ground water, surface water, and greenhouse gases, which they determine to be insignificant. Final EA at 24-37; FONSI at 48-52. These conclusions appear to be based on the assumptions that there would be no change "in the number of hydraulic fracturing operations on Federal and Indian lands as a result of implementing any of the four alternatives analyzed," and that any potential impacts from

hydraulic fracturing would be addressed by state or tribal regulations, industry guidance, or existing BLM requirements.  Final EA at 24, 35.  The Final EA offers only a superficial comparison of the Fracking Rule and state regulations and shows that the Fracking Rule remains more comprehensive than the requirements in many states, including with regard to:

- performance standards to ensure wellbore integrity;
- minimum storage tank requirements;
- baseline water testing; and
- measures to prevent frack hits.

*Id*. at Appendix 1.  The Final EA also references industry guidance that could help mitigate the risks associated with hydraulic fracturing, but notes that it has no data regarding compliance with such guidance.  *Id*. at 33-35.

## FIRST CAUSE OF ACTION
### (Violation of the APA, 5 U.S.C. § 706)

43.   Paragraphs 1 through 42 are realleged and incorporated herein by reference.

44.   An agency action is arbitrary and capricious under the APA where the agency (i) has relied on factors which Congress has not intended it to consider; (ii) entirely failed to consider an important aspect of the problem; (iii) offered an explanation for its decision that runs counter to the evidence before the agency; or (iv) is so implausible that it could not be ascribed to a difference of view or the product of agency expertise. *State Farm*, 463 U.S. at 43.  Moreover, an "agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change." *State Farm*, 463 U.S. at 42.  "[E]ven when reversing a policy after an election, an agency may not simply discard prior factual findings without a reasoned explanation." *Organized Village of Kake v. U.S. Dept. of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015).  Moreover, an agency cannot suspend a validly-promulgated rule without first "pursu[ing] available alternatives that might have corrected the deficiencies in the program which the agency relied upon to justify the suspension." *Public Citizen v. Steed*, 733 F.2d 93, 103 (D.C. Cir. 1984).

45.   Here, Defendants have failed to provide an explanation for the Final Repeal based on the same factual record that was before the agency during the multi-year rulemaking proceeding

that resulted in the adoption of the Fracking Rule. Defendants entirely failed to consider how the Final Repeal will achieve their statutory mandates to ensure that operations on federal leases are conducted with "reasonable diligence, skill and care," to protect "the interests of the United States," to safeguard "the public welfare" in federal mineral leases, to prevent unnecessary or undue degradation of the lands, or to fulfill their statutory trust responsibilities on tribal lands.

46. Defendants' stated justification of avoiding administrative burdens and compliance costs for operators is contradicted by their own findings that these compliance costs represent just a fraction of a percent of the profit margins for even the smallest operators and are otherwise insignificant.

47. Defendants' citation to Executive Order 13783 and Secretarial Order 3349 to justify the Final Repeal is contradicted by their admissions that the Final Repeal will have almost no impact on operator compliance costs or energy development on federal or Indian lands. Further, these Orders cannot contravene statutory mandates imposed upon Defendants by Congress.

48. Defendants' assertions that the potential impacts of hydraulic fracturing will be addressed by state or tribal regulations is contradicted by their own superficial analysis of such regulations, which shows that the Fracking Rule remains more comprehensive than the regulations in many states, and their admission that many tribes have yet to promulgate regulatory programs to address hydraulic fracturing. Defendants have also offered no reasoned explanation as to how state or tribal requirements will enable them to meet the stewardship standards that apply to federal lands or their trust responsibilities for Indian lands.

49. Defendants have failed to provide a reasoned explanation as to why their pre-existing regulations and authorities, which were in existence at the time that it promulgated the Fracking Rule, are now sufficient to address the risks posed by hydraulic fracturing.

50. Finally, Defendants failed to consider alternative solutions to address any alleged deficiencies with the Fracking Rule, such as through the issuance of guidance or making adjustments necessary to clarify certain provisions, rather than repealing the entire Fracking Rule.

Complaint for Declaratory and Injunctive Relief

51. Accordingly, Defendants acted in a manner that was arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of their statutory authority.  5 U.S.C. § 706. Consequently, the Final Repeal should be held unlawful and set aside.

## SECOND CAUSE OF ACTION

**(Violation of the MLA, FLPMA, IMLA, and APA;**

**30 U.S.C. §§ 187, 189; 43 U.S.C. §§ 1701, 1732; 25 U.S.C. § 396d; 5 U.S.C. § 706)**

52. Paragraphs 1 through 51 are realleged and incorporated herein by reference.

53. The MLA vests Defendants with broad responsibility to "prescribe necessary and proper rules and regulations" to ensure that operations on federal leases are conducted with "reasonable diligence, skill and care," to protect "the interests of the United States," and to safeguard "the public welfare" in federal mineral leases.  30 U.S.C. §§ 187, 189.

54. FLPMA mandates that Defendants manage public lands "in a manner that will protect the quality of … ecological, environmental, air and atmospheric, [and] water resource … values," 43 U.S.C. § 1701(a)(8), and requires Defendants to take any action, by regulation or otherwise, "necessary to prevent unnecessary or undue degradation of the lands."  *Id*. § 1732(b).

55. The IMLA provides Defendants with a trust responsibility to ensure that "[a]ll operations under any oil, gas, or other mineral lease issued pursuant to the terms of [the IMLA] or any other Act affecting restricted Indian lands shall be subject to the rules and regulations promulgated by the Secretary of the Interior."  25 U.S.C. § 396d.

56. When an agency rescinds a prior regulation, it is required to demonstrate "that the new policy is permissible under the statute" and that "that there are good reasons for it."  *F.C.C. v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009).

57. In promulgating the Final Repeal, Defendants entirely failed to consider or fulfill their statutory mandates to protect the interests of the United States and safeguard the public welfare or otherwise ensure the environmentally responsible development of oil and gas on public lands, or their statutory trust responsibilities for Indian lands.

58. Accordingly, Defendants acted in a manner that was arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of their statutory authority, in violation of

1  the MLA, FLPMA, IMLA, and APA.  30 U.S.C. §§ 187, 189; 43 U.S.C. §§ 1701, 1732; 25
2  U.S.C. § 396d; 5 U.S.C. § 706.  Consequently, the Final Repeal should be held unlawful and set
3  aside.

## THIRD CAUSE OF ACTION

### (Violation of NEPA and the APA;

### 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.3; 5 U.S.C. § 706)

7  59.  Paragraphs 1 through 58 are re-alleged and incorporated herein by reference.

8  60.  NEPA requires federal agencies to take a "hard look" at the environmental consequences of a proposed activity before taking action.  *See* 42 U.S.C. § 4332.  To achieve this purpose, a federal agency must prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment."  *Id.* § 4332(2)(C); 40 C.F.R. § 1502.3.  To determine whether a federal action will result in significant environmental impacts, the federal agency may first conduct an EA.  40 C.F.R. §§ 1501.4, 1508.9.  An EA must include a discussion of the need for the proposal, alternatives to the proposed action, the environmental impacts of the proposed action and alternatives, and must provide "sufficient evidence and analysis for determining whether to prepare" an EIS or a FONSI.  *Id.* § 1508.9.

17  61.  NEPA's implementing regulations specify several factors that an agency must consider in determining whether an action may significantly affect the environment, thus warranting the preparation of an EIS.  40 C.F.R. § 1508.27.  The presence of any single significance factor can require the preparation of an EIS.  "The agency must prepare an EIS if substantial questions are raised as to whether a project may cause significant environmental impacts."  *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 946 (9th Cir. 2014).

23  62.  As the comment letters from Plaintiff and others demonstrate, there are substantial questions, if not certainties, as to whether the Final Repeal may have significant environmental impacts.  In particular, the Final Repeal will result in significant adverse impacts including increased air pollution and related public health impacts, climate change harms, impacts to endangered, threatened, or rare species, and induced seismicity from the discharge of waste water in disposal wells.  These potential impacts, as well as many of the significance factors that NEPA

1  requires an agency to consider, including impacts to public health and safety, the degree to which
2  effects are likely to be highly controversial, and the degree to which potential effects are highly
3  uncertain or involve unique or unknown risks, were not addressed or even mentioned by
4  Defendants in the Final EA and FONSI.

5  63. Moreover, Defendants' assertions that the potential impacts of hydraulic fracking will
6  be addressed by state or tribal regulations is contradicted by their own superficial analysis of such
7  regulations, which shows that the Fracking Rule remains more comprehensive than the
8  regulations in many states, and their admission that many tribes have yet to promulgate regulatory
9  programs to address hydraulic fracturing.  In addition, Defendants' reliance on industry guidance
10 or best practices to mitigate potential risks is contradicted by Defendants' admission that they
11 have *no data* on industry's compliance with such measures.

12 64. Finally, Defendants' contention that the reduction in compliance costs associated with
13 the Final Repeal "appear to be an appropriate tradeoff for any potential lessening of the
14 assurances" that "operators conduct hydraulic fracturing in an environmentally sound and safe
15 manner; reduce the potential risks to surface and groundwater resources; and increase public
16 awareness and understanding of these operations," is irrelevant to the agency's consideration of
17 environmental impacts and does not provide the analysis required by NEPA.

18 65. Defendants' determination that the Final Repeal would result in no significant
19 impacts, and its reliance on a FONSI and failure to prepare an EIS, constitutes agency action
20 unlawfully or unreasonably withheld or delayed, in violation of the requirements of NEPA.
21 5 U.S.C. § 706(1).  Alternatively, Defendants' determination that the Final Repeal would result in
22 no significant impacts, and its reliance on a FONSI and failure to prepare an EIS, is arbitrary and
23 capricious, an abuse of discretion, and contrary to the requirements of NEPA.  5 U.S.C. § 706(2).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Issue a declaratory judgment that Defendants acted arbitrarily, capriciously, contrary to law, abused their discretion, and failed to follow the procedure required by law in their promulgation of the Final Repeal, in violation of the MLA, FLPMA, IMLA, NEPA, and APA;

2. Vacate the Final Repeal;

3. Issue a mandatory injunction compelling Defendants to reinstate the Fracking Rule in its entirety;

4. Award Plaintiff its costs, expenses, and reasonable attorneys' fees; and

5. Award such other relief as the Court deems just and proper.

Dated: January 24, 2018

Respectfully Submitted,

XAVIER BECERRA
Attorney General of California
DAVID A. ZONANA
Supervising Deputy Attorney General

/s/ George Torgun
GEORGE TORGUN
MARY S. THARIN
Deputy Attorneys General

*Attorneys for Plaintiff*
*State of California, by and through Xavier Becerra, Attorney General*