1

LAWRENCE VANDYKE
Deputy Assistant Attorney General

2

Environment and Natural Resources Division

3

United States Department of Justice
REBECCA JAFFE (NC Bar No. 40726)

4

CORINNE SNOW (TX Bar No 24083883)
150 M Street NE, 3rd Floor

5

Washington, D.C. 20002

6

Tel: (202) 305-0258
Fax: (202) 305-0506

7

rebecca.jaffe@usdoj.gov

8

corinne.snow@usdoj.gov
Counsel for Federal Defendants

9

IN THE UNITED STATES DISTRICT COURT

10

FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12

STATE OF CALIFORNIA, et al.,                    )
                                                )

13

        Plaintiffs,                             )
                                                )

14

                v.                              )   Case No. 4:18-cv-00521-HSG (related)

15

                                                )

16

U.S. BUREAU OF LAND                             )   Case No. 4:18-cv-00524-HSG (related)
MANAGEMENT, et al.,                             )

17

                                                )   **FEDERAL DEFENDANTS' CROSS**
        Defendants.                             )   **MOTION FOR SUMMARY JUDGMENT**

18

                                                )

19

SIERRA CLUB, et al.,                            )   Date:  December 5, 2019
                                                )   Time: 2:00 p.m.

20

        Plaintiffs,                             )   Judge: Haywood S. Gilliam, Jr.
                                                )

21

                v.                              )   Courtroom 2, 4th Floor,
                                                )   1301 Clay Street, Oakland, CA 94612

22

DAVID BERNHARDT, et al.,                        )

23

                                                )
        Defendants.                             )

24

                                                )

25

                                                )

26

27

28

Fed. Defs.' Combined Opp'n to Pls.' Mots. for Summ. J. & Cross-Motion for Summary Judgment
*California v. BLM*, 4:18-cv-00521-HSG; *Sierra Club v. Bernhardt*, 4:18-cv-00524-HSG

1

**TABLE OF CONTENTS**

2  TABLE OF AUTHORITIES ......................................................................................................... iii

3  EXHIBITS ................................................................................................................................... xii

4  LIST OF ABBREVIATIONS .................................................................................................... xiii

5  NOTICE OF MOTION .................................................................................................................. 1

6  MEMORANDUM OF POINTS AND AUTHORITIES ............................................................... 2

7     I.    Introduction ....................................................................................................................... 2

8     II.   Background ......................................................................................................................... 3

9        A.   Oil and Gas Development on Federal Lands ........................................................... 3

       B.   The 2015 Rule .......................................................................................................... 5

10       C.   The 2017 Rule .......................................................................................................... 5

11       D.   Procedural History ................................................................................................... 6

12    III.   Standard of Review ............................................................................................................ 7

13    IV.   Plaintiffs Lack Standing ..................................................................................................... 8

14       A.   Plaintiffs Failed to Establish Standing Because They Allege Harms from Hydraulic

15           Fracturing Generally, Not the 2017 Rule Specifically ........................................... 8

16       B.   Sierra Club Fails to Demonstrate Injury to ESA-Related Interests ........................ 10

17           1.   Sierra Club Failed to Provide Evidence that Its Members' Interests in ESA-Listed

18              Species Are Injured Presently by the 2017 Rule .............................................. 11

19           2.   Sierra Club Has Not Demonstrated Injury Because It Relies on a Hypothetical and

             Attenuated Chain of Independent Actions ....................................................... 13

20           3.   Sierra Club Has Not Shown that Rescission of the 2015 Rule's Tank Requirements

21              Caused Its Alleged ESA Injury ........................................................................ 17

22           4.   Sierra Club Has Not Shown that Rescission of the 2015 Rule Caused an ESA Injury

23              from Surface and Groundwater Pollution ........................................................ 22

24           5.   Sierra Club Has Not Shown Any ESA Injury from Rescission of the 2015 Rule's

25              Water Source and Volume Disclosure Requirements ....................................... 24

26       C.   California Lacks Standing Because It Asserts Parens Patriae Injuries, Not Direct

       Harms ..................................................................................................................... 26

27       D.   California Lacks Standing to Bring IMLA Claims ................................................. 29

28    V.   The 2017 Rule Satisfied the APA's Requirements .......................................................... 32

A.   The 2017 Rule Is Legally Permissible ...................................................... 32

B.   BLM Had "Good Reasons" and a Detailed Justification for the 2017 Rule ................ 35

   1.   Developments in State and Tribal Regulations and Industry Guidance .................. 36

   2.   BLM's Pre-Existing Regulations ................................................... 37

   3.   Cost-Benefit Analysis ............................................................. 38

C.   BLM Considered a Range of Alternatives ................................................ 41

VI.   NEPA Does Not Apply to the 2017 Rule, But BLM Satisfied NEPA Anyway ........... 42

A.   BLM Analyzed Water Quality and Quantity Impacts .................................... 44

B.   BLM Weighed Storage Tanks Versus Pits .............................................. 46

C.   BLM Considered Environmental Justice Impacts ....................................... 48

D.   BLM Had No Obligation to Prepare an EIS ............................................ 48

VII.   BLM Rationally Determined that Its 2017 Rule Does Not Affect ESA-Listed Species or Critical Habitat ...................................................................... 49

VIII.   ESA Claims Are Limited to Record Review ............................................ 52

IX.   Deliberative Documents Are Not Part of the Record .................................. 53

X.   Remedy ................................................................................. 56

XI.   Conclusion ............................................................................ 57

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

*Alaska v. Native Vill. of Venetie Tribal Gov't*,
522 U.S. 520 (1998)................................................................................................ 32

4

*Alaska v. United States*,

5

981 F.2d 1259 (9th Cir. 1992) .............................................................................. 27

6

*Alfred L. Snapp & Son, Inc. v. P.R. ex rel. Barez*,
458 U.S. 592 (1982) ................................................................................................ 27

7

*Allied–Signal, Inc. v. NRC*,

8

988 F.2d 146 (D.C. Cir. 1993) .............................................................................. 59

9

*Arrington v. Daniels*,

10

516 F.3d 1106 (9th Cir. 2008) .............................................................................. 44

11

*Ass'n of Am. Med. Coll. v. United States*,
217 F.3d 770 (9th Cir. 2000) .................................................................................. 8

12

*Assiniboine & Sioux Tribes of Fort Peck Indian Reservation v. Bd. of Oil & Gas Conservation of State of Mont.*,

13

792 F.2d 782 (9th Cir. 1986) .................................................................... 32, 36, 37

14

*Bateman v. U.S. Postal Serv.*,

15

231 F.3d 1220 (9th Cir. 2000) .............................................................................. 54

16

*Burbank Anti-Noise Grp. v. Goldschmidt*,
623 F.2d 115 (9th Cir. 1980) ................................................................................ 44

17

*Butte Envtl. Council v. U.S. Army Corps of Eng'rs*,

18

620 F.3d 936 (9th Cir. 2010) .................................................................................. 7

19

*Cal. Cmtys. Against Toxics v. EPA*,

20

688 F.3d 989 (9th Cir. 2012) ................................................................................ 59

21

*California v. Cabazon Band of Mission Indians*,
480 U.S. 202 (1987)................................................................................................ 33

22

*California v. U.S. Dep't of Labor*,

23

No. 2:13-CV-02069-KJM, 2014 WL 1665290 (E.D. Cal. Apr. 24, 2014) .............................. 57

24

*Camp v. Pitts*,
411 U.S. 138 (1973).......................................................................................... 8, 57

25

*Carlsson v. U.S. Citizenship & Immig. Servs.*,

26

No. 2:12-CV-07893-CAS, 2015 WL 1467174 (C.D. Cal. Mar. 23, 2015) ........................... 57

27

*Cent. Sierra Envtl. Res. Ctr. v. U.S. Forest Serv.*,

28

916 F. Supp. 2d 1078 (E.D. Cal. 2013) ........................................................... 15, 21

*Chuska Energy Co. v. Mobil Expl. & Producing N. Am., Inc.*,
854 F.2d 727 (5th Cir. 1988) ........................................................................... 32

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ........................................................................... 44, 56, 57

*City of L.A. v. Lyons*,
461 U.S. 95 (1983) ........................................................................... 10

*City of Littleton, Colo. v. Z.J. Gifts D-4, L.L.C.*,
541 U.S. 774 (2004) ........................................................................... 29

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........................................................................... 13, 15, 18, 22

*Clarke v. Sec. Indus. Ass'n*,
479 U.S. 388 (1987) ........................................................................... 31

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
563 F.3d 466 (D.C. Cir. 2009) ........................................................................... 28

*Davis v. Fed. Election Comm'n*,
554 U.S. 724 (2008) ........................................................................... 31

*Dep't of Commerce v. New York*,
139 S. Ct. 2551 (2019) ........................................................................... 38, 43

*Didrickson v. U.S. Dep't of Interior*,
982 F.2d 1332 (9th Cir. 1992) ........................................................................... 16

*Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*,
438 U.S. 59 (1978) ........................................................................... 27

*Earth Island Inst. v. U.S. Forest Serv.*,
697 F.3d 1010 (9th Cir. 2012) ........................................................................... 7

*Envtl. Def. Ctr., Inc. v. EPA*,
344 F.3d 832 (9th Cir. 2003) ........................................................................... 48

*Envtl. Def. Fund, Inc. v. Gorsuch*,
713 F.2d 802 (D.C. Cir. 1983) ........................................................................... 35

*Exp. Grp. v. Reef Indus.*,
54 F.3d 1466 (9th Cir. 1995) ........................................................................... 54

*F.C.C. v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ........................................................................... 33, 37, 42, 43, 61

*FERC v. Elec. Power Supply Ass'n*,
136 S. Ct. 760 (2016) ........................................................................... 43, 44

*Fla. Power & Light v. Lorion*,
470 U.S. 729 (1985) ........................................................................... 8

*Fleck & Assocs., Inc. v. Phoenix*,
  471 F.3d 1100 (9th Cir. 2006) ............................................................................ 10

*Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) ................................................................................... 8, 10

*Fund for Animals v. Kempthorne*,
  538 F.3d 124 (2d Cir. 2008) ............................................................................... 36

*FW/PBS, Inc. v. City of Dall.*,
  493 U.S. 215 (1990) ........................................................................................... 29

*Gardner v. Bureau of Land Mgmt.*,
  638 F.3d 1217 (9th Cir. 2011) ........................................................................... 35

*Gov't of Manitoba v. Bernhardt*,
  923 F.3d 173 (D.C. Cir. 2019) ..................................................................... 28, 30

*Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*,
  383 F.3d 1082 (9th Cir. 2004) ............................................................... 25, 26, 52

*Hollywood Mobile Estates, Ltd. v. Seminole Tribe of Fla.*,
  641 F.3d 1259 (11th Cir. 2011) ......................................................................... 32

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ........................................................................................... 10

*Idaho Wool Growers Ass'n v. Vilsack*,
  816 F.3d 1095 (9th Cir. 2016) ........................................................................... 42

*In re Hunter*,
  66 F.3d 1002 (9th Cir. 1995) ............................................................................... 8

*In re Subpoena Duces Tecum Served on Office of Comptroller of Currency*,
  156 F.3d 1279 (D.C. Cir. 1998) ......................................................................... 57

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
  681 F.3d 1006 (9th Cir. 2012) ........................................................................... 54

*Kokkonen v. Guardian Life Ins. Co.*,
  511 U.S. 375 (1994) ............................................................................................. 8

*Kootenai Tribe of Idaho v. Veneman*,
  313 F.3d 1094 (9th Cir. 2002) ........................................................................... 44

*Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*,
  42 F.3d 517 (9th Cir. 1994) ............................................................................... 50

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ........................................ 8, 9, 10, 11, 22, 23, 24, 29, 30, 51

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ..................................................................................... 11, 12

*Maryland v. Louisiana*,
   451 U.S. 725 (1981) ................................................................................................ 28, 29

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ................................................................................................ 27, 31

*Massachusetts v. Mellon*,
   262 U.S. 447 (1923) ...................................................................................................... 27

*McClanahan v. State Tax Comm'n of Ariz.*,
   411 U.S., 164 (1973) ...................................................................................................... 32

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................................................................ 7, 19, 27

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
   551 U.S. 644, (2007) ...................................................................................................... 53

*Nat'l Wildlife Fed'n v. Espy*,
   45 F.3d 1337 (9th Cir. 1995) ........................................................................................ 59

*Native Ecosystems Council v. U.S. Forest Serv.*,
   428 F.3d 1233 (9th Cir. 2005) ................................................................................ 50, 51

*Nevada v. Burford*,
   918 F.2d 854 (9th Cir. 1990) ........................................................................................ 27

*Ninilchik Traditional Council v. United States*,
   227 F.3d 1186 (9th Cir. 2000) ...................................................................................... 54

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) .......................................................................................................... 3

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*,
   117 F.3d 1520 (9th Cir. 1997) ...................................................................................... 16

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*,
   18 F.3d 1468 (9th Cir. 1994) .......................................................................................... 8

*Oceana, Inc. v. Ross*,
   920 F.3d 855 (D.C. Cir. 2019) ........................................................................ 55, 56, 57

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
   795 F.3d 956 (9th Cir. 2015) ............................................................................ 33, 34, 41

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Dep't of Interior*,
   996 F. Supp. 2d 887 (E.D. Cal. 2014) .......................................................................... 50

*Park Cty. Res. Council, Inc. v. U.S. Dep't of Agric.*,
   817 F.2d 609 (10th Cir. 1987) ........................................................................................ 3

*People ex rel. Lockyer v. U.S. Dep't of Agric.*,
   No. CIV.A05-0211 MCE GGH, 2005 WL 1719892 (E.D. Cal. July 18, 2005) ........... 27, 28, 29

*Portland Audubon Soc'y v. Endangered Species Comm.*,
  984 F.2d 1534 (9th Cir. 1993) ........................................................................ 57

*Pub. Citizen v. NRC*,
  901 F.2d 147 (D.C. Cir. 1990) ........................................................................ 35

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ........................................................................................ 44

*Rosebud Sioux Tribe v. McDivitt*,
  286 F.3d 1031 (8th Cir. 2002) ........................................................................ 32

*San Luis & Delta-Mendota Water Auth. v. Haugrud*,
  848 F.3d 1216 (9th Cir. 2017) ........................................................................ 13

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) ..................................................................... 7, 54

*San Luis Obispo Mothers for Peace v. NRC*,
  789 F.2d 26 (D.C. Cir. 1986) .......................................................................... 56

*San Xavier Dev. Auth. v. Charles*,
  237 F.3d 1149 (9th Cir. 2001) ........................................................................ 32

*Schimer v. U.S. Court of Appeals for the Ninth Circuit*,
  279 F.3d 817 (9th Cir. 2002) ............................................................... 10, 15, 29

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943) .......................................................................................... 56

*Sierra Club v. Morton*,
  405 U.S. 727 (1972) ................................................................................. 10, 12

*Sierra Forest Legacy v. Sherman*,
  646 F.3d 1161 (9th Cir. 2011) ........................................................................ 30

*Sierra Forest Legacy v. Sherman*,
  951 F. Supp. 2d 1100 (E.D. Cal. 2013) .......................................................... 59

*Stock W., Inc. v. Confederated Tribes of the Colville Reservation*,
  873 F.2d 1221 (9th Cir. 1989) .......................................................................... 8

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ................................................................... 8, 9, 10, 11, 17

*Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*,
  100 F.3d 1443 (9th Cir. 1996) ................................................................... 51, 52

*Tax Comm'n v. Sac & Fox Nation*,
  508 U.S. 114 (1993) ........................................................................................ 32

*Thompson v. Dep't of Labor*,
  885 F.2d 551 (9th Cir. 1989) .......................................................................... 56

*Today's IV, Inc. v. Fed. Transit Admin.*,
  No. 13-cv-378-JAK, 2014 WL 3827489 (C.D. Cal. May 29, 2014) ........................................ 8

*Town of Chester, N.Y. v. Laroe Estates, Inc.*,
  137 S. Ct. 1645 (2017) ........................................................................................................ 31

*United States v. Carlo Bianchi & Co.*,
  373 U.S. 709 (1963) ...................................................................................................... 54, 55

*United States v. Morgan (Morgan II)*,
  313 U.S. 409 (1941) ...................................................................................................... 56, 57

*United States v. Navajo Nation*,
  537 U.S. 488 (2003) ............................................................................................................ 32

*Valley Outdoor, Inc. v. City of Riverside*,
  446 F.3d 948 (9th Cir. 2006) ............................................................................................... 29

*Vill. of Los Ranchos De Albuquerque v. Marsh*,
  956 F.2d 970 (10th Cir. 1992) ............................................................................................... 3

*Village of False Pass v. Clark*,
  733 F.2d 605 (9th Cir. 1984) ............................................................................................... 54

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
  435 U.S. 519 (1978) ............................................................................................................ 58

*Westlands Water Dist. v. U.S. Dep't of Interior*,
  376 F.3d 853 (9th Cir. 2004) ............................................................................................... 44

*WildEarth Guardians v. U.S. Dep't of Justice*,
  752 F. App'x 421 (9th Cir. 2018) ......................................................................................... 14

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008) ...................................................................................................... 7, 17, 24

*Wyoming v. Oklahoma*,
  502 U.S. 437 (1992) ............................................................................................................ 30

*Wyoming v. U.S. Dep't of Agric.*,
  661 F.3d 1209 (10th Cir. 2011) .............................................................................. 45, 46, 50

*Wyoming v. U.S. Dep't of the Interior*,
  136 F. Supp. 3d 1317 (D. Wyo. 2015) ................................................................................... 5

*Wyoming v. U.S. Dep't of the Interior*,
  Nos. 2:15-CV-041-SWS & 2:15-CV-043-SWS, 2016 WL 3509415 (D. Wyo. June 21, 2016) 5

*Wyoming v. Zinke*,
  871 F.3d 1133 (10th Cir. 2017) ............................................................................................. 5

**Statutes**

5 U.S.C. § 551 ........................................................................................................................... 62

5 U.S.C. § 559 ........................................................................................................... 54

5 U.S.C. § 706 ....................................................................................................... 7, 55

5 U.S.C. § 706(2)(A) .................................................................................................. 7

15 U.S.C. § 78 ......................................................................................................... 35

16 U.S.C. §§ 668-668d ............................................................................................ 13

16 U.S.C. § 1532(6) ........................................................................................... 11, 51

16 U.S.C. § 1532(15) ............................................................................................... 11

16 U.S.C. § 1533(a) ........................................................................................... 11, 51

16 U.S.C. § 1536(a)(2) ............................................................................................. 51

16 U.S.C. § 1538 ..................................................................................................... 18

16 U.S.C. § 1540(g) ................................................................................................. 54

16 U.S.C. §§ 1531-1599 .......................................................................................... 51

21 U.S.C. § 2112(b) ................................................................................................. 57

25 U.S.C. § 396 ....................................................................................................... 62

25 U.S.C. § 396d ..................................................................................................... 34

25 U.S.C. § 2101 ..................................................................................................... 62

30 U.S.C. § 181 ................................................................................................... 3, 62

30 U.S.C. § 187 ....................................................................................................... 35

30 U.S.C. § 189 ................................................................................................. 34, 36

30 U.S.C. § 871 ....................................................................................................... 35

42 U.S.C. § 4321 ..................................................................................................... 44

42 U.S.C. §§ 6922–6924 .......................................................................................... 35

43 U.S.C. § 1701 ..................................................................................................... 62

43 U.S.C. § 1712(e) ................................................................................................... 4

43 U.S.C. § 1732(a) ................................................................................................... 3

43 U.S.C. § 1732(b) ................................................................................................. 34

43 U.S.C. § 4321 ..................................................................................................... 62

Cal. Fish & Game Code § 1016 ............................................................................... 18

**Rules**

Fed. R. App. P. 16 ................................................................................................ 58

Fed. R. Civ. P. 56(e) ..................................................................................... 8, 29

**Regulations**

40 C.F.R. § 1501.1 ............................................................................................. 44

43 C.F.R. § 3101.1-2 ............................................................................................ 4

43 C.F.R. § 3162.5-2(d) ..................................................................................... 39

50 C.F.R. § 17.11 ................................................................................................ 11

50 C.F.R. § 402.01(b) ......................................................................................... 11

50 C.F.R. § 402.02 ............................................................................................. 51

50 C.F.R. § 402.03 ............................................................................................. 51

50 C.F.R. § 402.12(b) ......................................................................................... 53

50 C.F.R. § 402.14(a) ......................................................................................... 51

50 C.F.R. § 402.14(b) ......................................................................................... 52

50 C.F.R. § 402.15(a) ......................................................................................... 52

58 Fed. Reg. 47,354 (Sept. 8, 1993) .................................................................. 18

58 Fed. Reg. 47,364 (Sept. 8, 1993) .................................................................. 18

72 Fed. Reg. 37,345 (July 9, 2007) .................................................................... 13

80 Fed. Reg. 16,128 (Mar. 26, 2015) ......................................................... 2, 5, 32

80 Fed. Reg. 16,130 (Mar. 26, 2015) ......................................................... 15, 42

80 Fed. Reg. 16,133 (Mar. 26, 2015) ......................................................... 32, 36

80 Fed. Reg. 16,141 (Mar. 26, 2015) ................................................................. 39

80 Fed. Reg. 16,162 (Mar. 26, 2015) ................................................................. 17

80 Fed. Reg. 16,168 (Mar. 26, 2015) ................................................................. 15

80 Fed. Reg. 16,190 (Mar. 26, 2015) ......................................................... 35, 36

80 Fed. Reg. 16,216 (Mar. 26, 2015) ................................................................. 50

80 Fed. Reg. 16,218 (Mar. 26, 2015) ................................................................. 59

80 Fed. Reg. 16,577 (Mar. 30, 2015) ................................................................. 59

80 Fed. Reg. 61,928 (Mar. 30, 2015) ................................................................. 48

82 Fed. Reg. 34,464 (July 25, 2017) .................................................................... 6

82 Fed. Reg. 61,924 (Dec. 29, 2017) ........................................................ 2, 6, 37, 41, 61

82 Fed. Reg. 61,925 (Dec. 29, 2017) .................................................................. 6, 37, 38

82 Fed. Reg. 61,926 (Dec. 29, 2017) .................................... 3, 33, 37, 38, 39, 42, 52, 53

82 Fed. Reg. 61,927 (Dec. 29, 2017) .......................................................................... 3, 4, 5

82 Fed. Reg. 61,928 (Dec. 29, 2017) .......................................................................... 4

82 Fed. Reg. 61,931 (Dec. 29, 2017) ......................................................................... 47

82 Fed. Reg. 61,935 (Dec. 29, 2017) ......................................................................... 35

82 Fed. Reg. 61,941 (Dec. 29, 2017) ................................................................... 52, 53

Cal. Code Regs. tit. 14, § 740 .................................................................................. 18

Exec. Order No. 13,783, 82 Fed. Reg. 16,093, § 1(a) (Mar. 28, 2017) ......................... 6

**Other Authorities**

Cal. Gov. Code §§ 12600-12612 .............................................................................. 28

Mineral Management Policy 612 FW 1,
    https://www.fws.gov/policy/612fw1.html#extractionsanddevelopment ................................ 16

N.D. Admin. Code § 43-02-03-19.3 ..................................................................... 18, 20

**EXHIBITS**

A.  Declaration of James Tichenor regarding exhibits (Aug. 1, 2019)

    1.   FracFocus spreadsheet indicating wells hydraulically fractured in California (June 19, 2019)

    2.   BLM, 2018 Annual Report for the December 22, 2017 Programmatic Biological Opinion on Oil and Gas (December 20, 2018)

    3.   BLM, Bakersfield Field Office Record of Decision and Approved Resource Management Plan (2014)

    4.   Excerpts of California DOGGR Annual Reports of the State Oil and Gas Supervisor (2009)

    5.   FWS, Programmatic Biological Opinion on Oil and Gas Activities on Bureau of Land Management lands in the San Joaquin Valley (2017)

    6.   Proclamation, Establishment of the Carrizo Plain National Monument (Jan. 17, 2001)

    7.   BIA, Mitigated Programmatic Environmental Assessment Oil and Gas Development on Trust Lands and Minerals Fort Berthold Indian Reservation (May 2017)

    8.   Map showing mineral ownership on Forth Berthold Indian Reservation

    9.   Programmatic Biological Assessment/Biological Evaluation for Oil and Gas Development for Fort Berthold Indian Reservation (2014)

    10.  Letter from FWS to BIA concurring with BIA's determinations of the effect on species in the Programmatic Biological Assessment/Biological Evaluation for Oil and Gas Development for Fort Berthold Indian Reservation (June 4, 2014)

    11.  BLM, Standard Oil and Gas Lease Stipulation 16-3

    12.  BLM, Sample Appendix K Surface Conditions of Approval

    13.  FWS, Formal Section 7 Consultation for BLM's Fluid Minerals Program in the [South] Platte River Basin, Colorado (Feb. 2, 2015).

    14.  BLM Letter to Operators re: South Platte Water Withdrawals (March 2, 2015)

B.  Declaration of James Tichenor regarding email (Aug. 1, 2019)

1

**LIST OF ABBREVIATIONS**

2

| | |
|---|---|
| 2015 Rule | "Oil and Gas; Hydraulic Fracturing on Federal and Indian Lands," 80 Fed. Reg. 16,128 (Mar. 26, 2015) |
| 2017 Rule | "Oil and Gas; Hydraulic Fracturing on Federal and Indian Lands; Rescission of a 2015 Rule," 82 Fed. Reg. 61,924 (Dec. 29, 2017) |
| ACEC | Areas of Critical Environmental Concern |
| APD | Application for Permit to Drill |
| API | American Petroleum Institute |
| BA | Biological Assessment |
| BIA | Bureau of Indian Affairs |
| BLM | Bureau of Land Management |
| DOGGR | California Division of Oil, Gas, and Geothermal Resources |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FLPMA | Federal Land Policy Management Act |
| FONSI | Finding of No Significant Impact |
| FWS | Fish and Wildlife Service |
| IMDA | Indian Mineral Development Act |
| IMLA | Indian Mineral Leasing Act |
| MLA | Mineral Leasing Act |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| RMP | Resource Management Plan |
| Sierra Club | Plaintiffs Sierra Club, Center for Biological Diversity, Diné Citizens Against Ruining Our Environment, Earthworks, Fort Berthold Protectors of Water and Earth Rights, Southern Utah Wilderness Alliance, The Wilderness Society, and Western Resource Advocates |

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE OF MOTION

PLEASE TAKE NOTICE THAT on December 5, 2019, at 2:00 p.m. before the Honorable Haywood S. Gilliam, Jr., Courtroom 2, 4th Floor, 1301 Clay Street, Oakland, CA 94612, Federal Defendants, the Bureau of Land Management; the U.S. Department of the Interior; Joseph Balash, in his official capacity as Assistant Secretary for Land and Minerals Management, U.S. Department of the Interior; and David Bernhardt, in his official capacity as Secretary of the Interior, will move the Court to enter summary judgment on behalf of the Federal Defendants.  This motion is supported by Federal Rule of Civil Procedure 56 and the attached Memorandum of Points and Authorities.

1

2                    **MEMORANDUM OF POINTS AND AUTHORITIES**

3    **I.    Introduction**

4          The Bureau of Land Management ("BLM") promulgated the regulation titled "Oil and

5    Gas; Hydraulic Fracturing on Federal and Indian Lands; Rescission of a 2015 Rule," 82 Fed.

6    Reg. 61,924 (Dec. 29, 2017) ("2017 Rule"), to remove burdensome regulatory requirements.

7    The rule it rescinded—titled "Oil and Gas; Hydraulic Fracturing on Federal and Indian Lands,"

8    80 Fed. Reg. 16,128 (Mar. 26, 2015) ("2015 Rule")—sought to regulate hydraulic fracturing[1] on

9    federal and Indian lands, but it never went into effect.  Nonetheless, in promulgating the 2017

10   Rule, BLM considered the 2015 Rule's anticipated benefits and environmental effects and

11   concluded that state regulations, tribal regulations, existing BLM regulations, and updated

12   industry guidance made the 2015 Rule unnecessary and duplicative.

13         California and several environmental groups, Sierra Club, Center for Biological Diversity,

14   Diné Citizens Against Ruining Our Environment, Earthworks, Fort Berthold Protectors of Water

15   and Earth Rights, Southern Utah Wilderness Alliance, The Wilderness Society, and Western

16   Resource Advocates (collectively, "Sierra Club"), have challenged the 2017 Rule, but the Court

17   should enter summary judgment for Federal Defendants because Plaintiffs lack standing.  Even if

18   the Court could properly reach the merits, summary judgment for Federal Defendants would be

19   warranted because BLM complied with the Administrative Procedure Act ("APA"), National

20   Environmental Policy Act ("NEPA"), and Endangered Species Act ("ESA") in promulgating the

21   2017 Rule.

22

23

24

25   _____

26   [1] Hydraulic fracturing is a well stimulation technique that involves injecting fluid, which consists
     of water and chemical additives, under high pressure to create or enlarge fractures in rocks.
27   HFRR_000158.  The fluid usually contains proppants, such as sand, to keep the fractures open.
     *Id*.  The fractures then allow oil and gas to flow into the well.  *Id*.
28

## II.   **Background**

### A. Oil and Gas Development on Federal Lands

BLM manages federal lands "under principles of multiple use and sustained yield."  43 U.S.C. § 1732(a).  "'Multiple use management' is a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put, 'including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish . . . .'"  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 58 (2004) (quoting 43 U.S.C. § 1702(c)).  Congress has expressly provided for development of oil and gas resources on public lands.  *See* 30 U.S.C. § 181.  As the Tenth Circuit has explained, "[i]t is the stated public policy of the United States to make public lands . . . available for mineral leasing in an effort to reduce our energy dependence on foreign sources and to protect our national security."  *Park Cty. Res. Council, Inc. v. U.S. Dep't of Agric.*, 817 F.2d 609, 620 (10th Cir. 1987), *overruled on other grounds by Vill. of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992).

Generally, oil and gas development on federal lands involves three stages.  First, BLM develops an area-wide resource management plan ("RMP"), which specifies public lands that are appropriate for oil and gas leasing.  82 Fed. Reg. 61,926.  The RMP identifies the terms and conditions—including stipulations that must be incorporated into oil and gas leases—under which BLM will allow oil and gas development while protecting other resource values.  82 Fed. Reg. 61,927.  The public has the opportunity to comment on and participate in BLM's development of RMPs.  HFRR_034631.  Through the RMP, BLM may also prohibit oil and gas leasing in certain areas to protect sensitive resources or recreation areas.  82 Fed. Reg. 61,927; HFRR_034631.  BLM prepares an Environmental Impact Statement ("EIS") under NEPA for each RMP, and the EIS analyzes, inter alia, oil and gas development related impacts that may be expected to occur over the life of an RMP (typically 20 years).  82 Fed. Reg. 61,926–27.  If there are ESA-listed species in the RMP area, BLM must also ensure compliance with the ESA and determine whether certain areas can be authorized for oil and gas activities, or whether additional restrictions are needed to protect the listed species.  *Id.*  When BLM manages the mineral estate

for surface lands managed by other agencies, such as the Forest Service, the other agencies use their own planning documents to determine whether those lands are suitable for oil and gas development.  HFRR_034631.

At the second stage, interested parties must obtain a lease and BLM conducts another layer of NEPA review before selling any leases.  82 Fed. Reg. 61,927.  BLM may only issue leases within areas that are open to leasing under the RMP.  43 U.S.C. § 1712(e).  Once again, BLM must ensure that leasing decisions comply with the ESA, including through consultation with the Fish and Wildlife Service ("FWS") as necessary.  *Id.*

At the third stage, operators must submit and obtain BLM approval of a site-specific Application for Permit to Drill ("APD").  82 Fed. Reg. 61,927.  BLM's approval of an APD is also subject to NEPA review and public comment.  *Id.*  The APD must provide the operator's drilling plan; surface use plan, including plans to protect groundwater and surface water; plans for casing, including size, grade, weight, and depth of casing strings;[2] proposed drilling fluids; and specifications for blowout prevention equipment.  82 Fed. Reg. 61,927–28.  Operators must also provide geological information, including the estimated depths and thicknesses of geological formations, the zones containing potentially usable water, and plans for protecting usable water.  82 Fed. Reg. 61,927.  Operators must also describe their plans for containing and disposing of drilling fluids and produced water from drilling.  82 Fed. Reg. 61,928.  BLM evaluates the sufficiency of operators' plans, particularly the plans to protect usable water zones.  *Id.*  BLM may condition APD approval on the lessee's adoption of "reasonable measures," delimited by the lease and the lessee's surface use rights, to mitigate the drilling's environmental impacts.  43 C.F.R. § 3101.1-2.

When trust or restricted Indian lands are involved, the tribe or individual Indian owner leases their own oil and gas resources with the consent of the Department of the Interior's

---

[2] Casing strings are connected sections of cemented wellbore pipe.

Bureau of Indian Affairs ("BIA").  82 Fed. Reg. 61,927.  In addition, the BLM regulates oil and gas operations on trust and restricted Indian lands, applying the same operating regulations that apply on federal lands.  *Id.*

### B.  The 2015 Rule

On March 26, 2015, BLM published the 2015 Rule to complement existing oil and gas regulations.  80 Fed. Reg. 16,128.  The 2015 Rule never went into effect.  As soon as BLM announced and published the 2015 Rule, four states (Wyoming, Colorado, North Dakota, and Utah), two industry groups (Independent Petroleum Association of America and Western Energy Alliance), and the Ute Indian Tribe filed suit in the District of Wyoming.  The Wyoming District Court issued a preliminary injunction barring BLM from enforcing the 2015 Rule.  *Wyoming v. U.S. Dep't of the Interior*, 136 F. Supp. 3d 1317, 1354 (D. Wyo. 2015), *vacated and remanded sub nom. Wyoming v. Sierra Club*, Nos. 15-8126 & 15-8134, 2016 WL 3853806 (10th Cir. July 13, 2016).  The District of Wyoming concluded that BLM lacked legal authority to regulate hydraulic fracturing and issued a final decision setting aside the 2015 Rule.  *Wyoming v. U.S. Dep't of the Interior*, Nos. 2:15-CV-041-SWS & 2:15-CV-043-SWS, 2016 WL 3509415, at *12 (D. Wyo. June 21, 2016), *judgment vacated and appeal dismissed sub nom. Wyoming v. Zinke*, 871 F.3d 1133 (10th Cir. 2017).

Several environmental groups and BLM appealed the Wyoming Court's decisions to the Tenth Circuit, which held that the appeals were prudentially unripe because BLM had begun the process to propose rescission of the 2015 Rule under the new Administration.  *Wyoming*, 871 F.3d at 1137.  The Tenth Circuit "dismiss[ed] these appeals and remand[ed] with directions to vacate the district court's opinion and dismiss the action without prejudice."  *Id.*

### C.  The 2017 Rule

On March 28, 2017, President Donald J. Trump issued an Executive Order titled "Promoting Energy Independence and Economic Growth," stating that "[i]t is in the national interest to promote clean and safe development of our Nation's vast energy resources, while at

the same time avoiding regulatory burdens that unnecessarily encumber energy production, constrain economic growth, and prevent job creation." Exec. Order No. 13,783, 82 Fed. Reg. 16,093, § 1(a) (Mar. 28, 2017). That Executive Order directed agencies to "immediately review existing regulations that potentially burden the development or use of domestically produced energy resources and appropriately suspend, revise, or rescind those that unduly burden the development of domestic energy resources beyond the degree necessary to protect the public interest or otherwise comply with the law." *Id.* That Order directed the Secretary of the Interior to "review" the 2015 Rule, among other rules, and "if appropriate, . . . as soon as practicable, . . . publish for notice and comment proposed rules suspending, revising, or rescinding" the Rule. *Id.* at 16,096.

To implement that Executive Order, Secretary of the Interior Ryan Zinke issued Secretary's Order No. 3349 titled, "American Energy Independence," which directed BLM to proceed expeditiously with proposing to rescind the 2015 Rule.

On July 25, 2017, BLM published a proposed rule to rescind the 2015 Rule. 82 Fed. Reg. 34,464 (July 25, 2017). On December 29, 2017, BLM published a final rule rescinding the 2015 Rule because it imposed unjustified administrative and compliance costs and was duplicative of other regulations. 82 Fed. Reg. 61,924–25.

### D.  Procedural History

California and Sierra Club filed separate suits challenging the 2017 Rule. Complaint, *California v. Bureau of Land Mgmt*, No. 18-521 (N.D. Cal. Jan. 24, 2018), ECF No. 1; Complaint, *Sierra Club et al. v. Bernhardt*, No. 18-524 (N.D. Cal., Jan. 24, 2018), ECF No. 1. Federal Defendants moved to transfer these suits to Wyoming, and the Court denied that motion because, inter alia, "[t]he issue before this Court—the legality of BLM's rescission of the HF Rule"—was distinct from the issue in the Wyoming litigation, namely the validity of the 2015 Rule. ECF No. 77 at 9. Federal Defendants lodged the administrative record, the Court adjudicated certain record disputes, and the parties addressed other disputes via stipulations.

Civ. 18-521, ECF Nos. 85, 87, 95, 97, 98, 108, 107, 110, 114, 115; Civ. 18-524, ECF Nos. 86,

87, 93, 95, 96, 106, 105, 108, 124, 125.  Plaintiffs moved for summary judgment, and Federal

Defendants now submit their combined opposition to Plaintiffs' motions for summary judgment

and cross-motion for summary judgment.  Civ. 18-521, ECF No. 112; Civ. 18-524, ECF No.

110.

### III.   Standard of Review

The Court reviews APA, NEPA, and ESA claims under the standard and scope of review

set forth in the APA, 5 U.S.C. § 706.  *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d

581, 601 (9th Cir. 2014).  Under the APA, a court may set aside an agency action only if it is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.

§ 706(2)(A).  Review under this standard "is narrow, and a court is not to substitute its judgment

for that of the agency."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

29, 43 (1983).  An agency's decision can be set aside "only if the agency relied on factors

Congress did not intend it to consider, entirely failed to consider an important aspect of the

problem, or offered an explanation that runs counter to the evidence before the agency or is so

implausible that it could not be ascribed to a difference in view or the product of agency

expertise."  *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1013 (9th Cir. 2012) (quoting

*Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008)).  An agency need only articulate a

"rational connection between the facts found and the choice made."  *Motor Vehicle*, 463 U.S. at

43.  Thus, the Court must "not substitute its [own] judgment for that of the agency" and should

uphold even an unclear decision where the agency's path may be reasonably discerned.  *Butte*

*Envtl. Council v. U.S. Army Corps of Eng'rs*, 620 F.3d 936, 945 (9th Cir. 2010).

Because review under the APA is limited to the agency's administrative record, *Florida*

*Power & Light v. Lorion*, 470 U.S. 729, 744 (1985); *Camp v. Pitts*, 411 U.S. 138, 142 (1973), the

Court is not required to resolve disputed facts and "summary judgment is the appropriate method

by which the merits of the case can be decided," *Today's IV, Inc. v. Fed. Transit Admin.*, No. 13-

cv-378-JAK, 2014 WL 3827489, at *6 (C.D. Cal. May 29, 2014) (citing *Nw. Motorcycle Ass'n v.*

1    *U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994)).

2    **IV.    Plaintiffs Lack Standing**

3           "A federal court is presumed to lack jurisdiction in a particular case unless the contrary

4    affirmatively appears." *Stock West, Inc. v. Confederated Tribes of the Colville Reservation*, 873

5    F.2d 1221, 1225 (9th Cir. 1989) (citation omitted). The party seeking to sue in federal court

6    bears the burden of establishing that the court has subject matter jurisdiction to hear the action.

7    *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994); *Ass'n of Am. Med. Coll. v. United*

8    *States*, 217 F.3d 770, 778–79 (9th Cir. 2000). Absent such proof, jurisdiction presumptively

9    does not exist. *See In re Hunter*, 66 F.3d 1002, 1005 (9th Cir. 1995). At the summary judgment

10   phase, Plaintiffs "can no longer rest on such mere allegations, but must 'set forth' by affidavit or

11   other evidence specific facts, Fed. Rule Civ. Proc. 56(e), which for purposes of the summary

12   judgment motion will be taken to be true." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561

13   (1992) (quotations omitted).

14

15           **A.    Plaintiffs Failed to Establish Standing Because They Allege Harms from
                   Hydraulic Fracturing Generally, Not the 2017 Rule Specifically**

16

17           To seek injunctive relief, a plaintiff must show that he is under threat of suffering "injury

18   in fact" that is concrete and particularized; the threat must be actual and imminent, not

19   conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant;

20   and it must be likely that a favorable judicial decision will prevent or redress the injury.

21   *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (citing *Friends of Earth, Inc. v. Laidlaw*

22   *Environmental Services (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). Where, as here, Plaintiffs

23   are not themselves the "object of the government action or inaction [they] challenge[], standing

24   is not precluded, but it is ordinarily substantially more difficult to establish." *Lujan*, 504 U.S. at

25   562 (1992). Under these circumstances, it "becomes the burden of the plaintiff to adduce facts"

26   showing that the "unfettered choices made by independent actors" "have been or will be made in

27   such manner as to produce causation and permit redressability of injury." *Id.*

28           None of the Plaintiffs meet this test. Plaintiffs' alleged harms are not "fairly traceable" to

the 2017 Rule itself; they are instead general harms related to hydraulic fracturing that were not addressed by the 2015 Rule and therefore cannot be traced to the repeal of that Rule.

The 2015 Rule never purported to ban or regulate all aspects of hydraulic fracturing on BLM land.  This matters because, in their standing declarations, Sierra Club's members make a number of generic statements about the environmental problems caused by oil and gas activities generally and hydraulic fracturing in particular.  *See, e.g.,* Declaration of Ileene Anderson ("Anderson Decl.") ¶27, Case No. 4:18-cv-00524-HSG, ECF No. 110-3 ("Conventional oil and gas extraction in southern California has already damaged or permanently destroyed wildlife habitat for species that I care deeply about . . . ."); Declaration of Lisa Deville ("Deville Decl.") ¶16, Case No. 4:18-cv-00524-HSG, ECF No. 110-3 (alleging harm by a pipeline not regulated by either the 2015 or 2017 Rule); Declaration of Jolleta Bird Bear ("Bird Bear Decl."), ¶ 15, Case No. 4:18-cv-00524-HSG, ECF No. 110-3.  The 2015 Rule would not have prevented any of these alleged harms, and Plaintiffs' proposed remedy of reinstating the 2015 Rule would provide them no redress.

Similarly unavailing is Sierra Club's assertion that its members have been injured in the past due to actions by third parties who have allegedly failed to comply with *other* state and federal regulations.  *See, e.g.,* Deville Decl. ¶17 (alleging illegal treatment of bald eagles by oil company representative).  These allegations cannot serve as evidence that the 2017 Rule was the source of their injury, or that such injuries could be redressed by this Court if it enjoined the 2017 Rule.  *See Summers v. Earth Island Inst.*, 555 U.S. 488, 495 (2009).  Past instances of non-compliance by independent third parties cannot serve as the basis for standing as to the 2017 Rule.  *See Lujan*, 504 U.S. at 571 (rejecting standing where it is "entirely conjectural whether the nonagency activity that affect[ed]" plaintiffs would have been "altered or affected by the agency activity"); *Id.* at 564 ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983))).  Because these harms are beyond the scope of the 2015 Rule, they cannot be fairly traced to the 2017 Rule.

**B. Sierra Club Fails to Demonstrate Injury to ESA-Related Interests**

Sierra Club failed to provide evidence that its members' interests in ESA-listed species are presently injured by the 2017 Rule or will be injured in the future.  Where, as here, Sierra Club is bringing suit on behalf of its members, its standing depends on a demonstration that its members "would otherwise have standing to sue in their own right."  *Friends of the Earth, Inc.*, 528 U.S. at 181 (citing *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)); *Fleck & Assocs., Inc. v. Phoenix*, 471 F.3d 1100, 1106-07 (9th Cir. 2006).  As a result, Sierra Club relies on the facts in the standing declarations of its members to support its standing.  *See* Standing Decls., Ex. C to Sierra Club Mot. for Summ. J., No. 4:18-cv-00524-HSG, ECF110-3.  As the Supreme Court has explained, "the 'injury in fact' test requires more than an injury to a cognizable interest.  It requires that the party seeking review be himself among the injured." *Sierra Club v. Morton*, 405 U.S. 727, 735–36 (1972); *see also Schimer v. U.S. Court of Appeals for the Ninth Circuit*, 279 F.3d 817, 822 (9th Cir. 2002).  To establish standing in the realm of alleged environmental injury, Plaintiffs must plead specific plans to return to the area which will be impacted by the challenged agency decision before sufficient injury in fact can be found. *Lujan*, 504 U.S. at 564; *Summers*, 555 U.S. at 498–99.  This is particularly true when Plaintiffs challenge a nationwide rule whose implementation will vary greatly across the country and depend on a number of independent decisions.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990) (insufficient for plaintiffs to aver use "in the vicinity" of federal action because "Rule 56(e) is assuredly not satisfied by averments which state only that one of respondent's members uses unspecified portions of an immense tract of territory, on some portions of which mining activity has occurred or probably will occur by virtue of the governmental action.  It will not do to 'presume' the missing facts because without them the affidavits would not establish the injury that they generally allege."); *Summers*, 555 U.S. at 495 (no standing where "[t]here may be a chance, but is hardly a likelihood, that Bensman's wanderings will bring him to a parcel about to be affected by a project unlawfully subject to the regulations").  Sierra Club has not met its

1    burden here.

2        1.   *Sierra Club Failed to Provide Evidence that Its Members' Interests in ESA-
            Listed Species Are Injured Presently by the 2017 Rule*

3

4        The ESA's provisions do not apply to *all* wildlife species: instead, the Act provides legal

5    protections for only for threatened and endangered plants and animals "listed" under the Act and

6    their habitats.  16 U.S.C. § 1532(6), (20).[3]  To show standing for the ESA claims, it is therefore

7    insufficient to demonstrate that an action could affect wildlife.  Instead, Sierra Club must adduce

8    evidence that its members have an interest in specific listed species, and that those interests are

9    impacted by the 2017 Rule.  *See Lujan*, 504 U.S. at 563 (requiring "affidavits or other evidence

10   showing, through specific facts, not only that listed species were in fact being threatened" by the

11   challenged action, "but also that one or more of respondents' members would thereby be

12   'directly' affected apart from their 'special interest' in th[e] subject.").

13       Sierra Club does not, and cannot, meet this burden.  While Sierra Club asserts that the

14   2017 Rule could impact wildlife around the country, it provided declarations indicating that it

15   has members interested in listed species in only two regions that could theoretically be impacted

16   by the implementation of 2017 Rule: the Bakersfield area of California, and the Fort Berthold

17   Indian Reservation in North Dakota.  Anderson Decl., ¶¶ 8-10, 12-15; Deville Decl., at 47.[4]  As a

18

19   ─────────────────────

20   [3] The ESA is co-administered by FWS, an agency of the Department of the Interior and/or the
    National Marine Fisheries Service ("NMFS"), an agency of the Department of Commerce.

21   These agencies are collectively referred to as the "Services."  NMFS generally has jurisdiction
    over marine and anadromous species, while FWS generally has jurisdiction over terrestrial

22   species.  16 U.S.C. § 1532(15); 50 C.F.R. §§ 17.11, 402.01(b).  The ESA charges these agencies
    with making determinations regarding what animal and plant species should be listed under, and

23   thus protected by, the ESA.  16 U.S.C. § 1533(a).  The species that fall under the ESA's
    protections are referred to in this brief as "listed" species.  FWS and NMFS also make

24   determinations regarding the critical habitat for listed species, and consult with other federal
    agencies regarding the effect that their actions are likely to have on listed species and their

25   critical habitat.

26

27   [4] Ileene Anderson asserts personal interest in BLM-managed land across central and southern
    California within the Bakerfield Field office management area, and notes that areas she visits

28

result, Sierra Club must prove that the specific listed species have been, or will be, injured by the 2017 Rule, in those two regions. *See Lujan*, 504 U.S. at 566 ("To say that the [ESA] protects ecosystems is not to say that the Act creates (if it were possible) rights of action in persons who have not been injured in fact, that is, persons who use portions of an ecosystem not perceptibly affected by the unlawful action in question."); *Nat'l Wildlife Fed'n*, 497 U.S. at 889 (insufficient for plaintiffs to aver use "in the vicinity" of federal action); *Morton*, 405 U.S. at 735 (injury will be felt directly only by those who use areas that will be impacted by agency action).[5]  Although the 2017 Rule is already in effect, neither of these declarations provides evidence of injuries to the specific species in the specific areas where Plaintiffs allege an interest.  Instead, they express concerns that these species may be injured in the future. *See, e.g.*, Anderson Decl. ¶¶ 21-24; Deville Decl. ¶¶ 16, 26.[6]

Likewise, as discussed further in section VI.B.3, the studies cited by Sierra Club do not establish a present injury. *See* 4:18-cv-00524-HSG, ECF No.110-2.  First, a number of the cited

---

serve as habitat for listed species including the California Condor, Tipton's Kangaroo Rat, San Joaquin kit fox, blunt-nosed leopard lizard, and the giant kangaroo rat.  Lisa Deville asserts an interest in land within the Fort Berthold Indian Reservation in North Dakota, including an interest in listed species such as the Dakota Skipper, White Pallid Sturgeon, Northern Long Eared Bat, Black footed ferret, Whooping crane, and Piping Plover.  Both individuals also note an interest in additional wildlife that are not listed under the ESA, and therefore not covered by the ESA's protections.  As a result, an interest in these species not listed under the ESA cannot serve as the basis for standing for their ESA claims.  Joletta Bird Bear also lives on the Fort Berthold Indian Reservation and notes the presence of listed species on the reservation.  Bird Bear Decl., ¶¶ 1, 13.  However, she does not assert an interest in these listed species.

[5] Sierra Club's citations to the record, ECF 110 at 27, relate to species in Utah and Wyoming, rather than the areas where its members have averred an interest.  They also relate to species other than those where its members have averred an interest.  As a result, these citations cannot support standing.

[6] Ms. Deville alleges past illegal conduct towards bald eagles.  *See* Deville Decl. ¶ 17.  Bald eagles are federally protected, but not under the ESA.  Bald and Golden Eagle Protection Act, 16 U.S.C. §§ 668-668d, 72 Fed. Reg. 37,345.  This alleged conduct therefore cannot serve as the basis for a harm to sue under the ESA.

---

studies are more than a decade old and do not reflect current practices.  Second, a number of the more recent BLM or FWS documents included by Sierra Club actually reflect practices that the agencies have put in place to protect listed species from impacts associated with oil and gas activities.  *See, e.g.,* 4:18-cv-00524-HSG, ECF No.110-2 at 84 ("The following measures have been developed by BLM and USFWS and applied to past oil and gas projects near condor roosting and nesting areas.").  As a result, Sierra Club failed to demonstrate that it is currently suffering any injury caused by the 2017 Rule.

> 2. *Sierra Club Has Not Demonstrated Injury Because It Relies on a Hypothetical and Attenuated Chain of Independent Actions*

Plaintiffs cannot reply "on a highly attenuated chain of possibilities," to establish standing for a future injury.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).  Here, the series of events that must occur before Sierra Club's alleged future harm is realized is "both too uncertain and too remote to constitute a reasonably probable threat of injury."  *San Luis & Delta-Mendota Water Auth. v. Haugrud*, 848 F.3d 1216, 1233 (9th Cir. 2017), *as corrected* (Mar. 23, 2017).  The Ninth Circuit recently determined that plaintiffs in another ESA challenge lacked standing because their alleged injury was not fairly traceable to the challenge policy.  *See WildEarth Guardians v. U.S. Dep't of Justice*, 752 F. App'x 421, 423 (9th Cir. 2018).  As the *WildEarth Guardians* court explained, the link between plaintiffs' injury—increased Mexican wolf killings—and the challenged policy "necessarily rests upon several layers of speculation," because it required the court to guess how both agencies and private parties would react to the change in policy in the future.  *Id.*  Likewise, the link between Plaintiffs' alleged injury to species and the 2017 Rule is too attenuated to support Article III standing.

The 2017 Rule does not itself trigger any oil and gas activities in any particular regions. Rather, as explained above, oil and gas activities move forward only through regional and site-specific decisonmaking on both the part of the Agency and independent third-parties, and not from anything the 2017 Rule does or does not do.  Thus, at this stage, Sierra Club's asserted harms stem from a series of independent actions—(1) that BLM has or will create RMPs

1   allowing for hydraulic fracturing in the areas where listed species they are concerned about live,

2   (2) that BLM has or will put these areas of concern out for lease, (3) that industry members have

3   or will make the independent decisions to seek to lease the land and choose to engage in

4   hydraulic fracturing operations in those specific areas, (4) that BLM has or will grant a permit to

5   drill at a specific site and fail to include measures in the permit to protect listed species and (5)

6   that the operators would conduct hydraulic fracturing operations in a manner that harms listed

7   species, but which would have not occurred under the 2015 Rule.  HFRR_000145–47.  Even

8   then, before Sierra Club's alleged harms could be realized, the particular oil and gas operators in

9   the particular areas of concern to Plaintiffs would also have to ignore industry best practices, and

10  in some cases flout state regulations, for a listed species to be impacted by absence of the

11  specific provisions in the 2015 Rule that Plaintiffs have identified.

12        Because no species' critical habitat is coextensive with all BLM lands that could possibly

13  be subject to hydraulic fracturing operations, it is these independent decisions by BLM and

14  individual operators to lease land and provide permits that will determine if any specific areas

15  where any particular species listed under the ESA, or visited by Plaintiffs, will be subject to

16  hydraulic fracturing operations at all.  It is also these subsequent BLM decisions—all of which

17  are subject to review under the ESA—that will determine the nature of any hydraulic fracturing

18  operations allowed at specific sites.  But until that point, it is mere speculation to assume that any

19  listed species, let alone any listed species in which Sierra Club has a cognizable interest, will be

20  in any way affected by the 2017 Rule.  *See Schmier*, 279 F.3d at 821 (injuries must be distinct

21  and palpable, as opposed to merely abstract, hypothetical, or speculative).

22        Ms. Anderson's specific allegations provide an example of how "highly attenuated" the

23  "chain of possibilities," is between the 2017 Rule and any injury to her.  *See Clapper*, 568 U.S.

24  at 410.  In California, hydraulic fracturing is very rare in areas under BLM's jurisdiction.

According to the FracFocus database,[7] there have been a total of only 35 federal wells hydraulically fractured in California since record keeping began.  There were only two wells hydraulically fractured in 2014, two wells in 2015, and no federal wells fractured in California since 2015.  *See* Ex. 1, FracFocus spreadsheet indicating wells hydraulically fractured in California (June 19, 2019) (attached to Decl. of James Tichenor regarding exhibits, attached hereto as Exhibit A).[8]  *See also* Ex. 5, FWS, Programmatic Biological Opinion on Oil and Gas Activities on Bureau of Land Management lands in the San Joaquin Valley (2017) (attached to Ex. A) at 8 (noting that "[i]n California, less than 10% of new wells on BLM mineral estate are hydraulically fractured.").  Second, BLM has only identified limited areas under its jurisdiction in the Bakersfield region with potential for oil and gas activities, meaning that much of the area is unlikely to ever be fractured in the future.  *See* Ex. 3, BLM, Bakersfield Field Office Record of Decision and Approved Resource Management Plan (2014) Map 2.22 (attached to Ex. A).[9]

Third, Ms. Anderson asserts an interest in a number of specific areas that BLM already manages

---

[7] FracFocus is a public database managed by the Ground Water Protection Council, an organization of state water quality regulatory agencies, and by the Interstate Oil and Gas Compact Commission, a multi-state government agency charged with balancing oil and gas development with environmental protection.  80 Fed. Reg. 16,130.  FracFocus publishes information about operators' disclosures of chemicals used in hydraulic fracturing fluids.  80 Fed. Reg. 16,168.

[8] North Dakota and California state law requirement that operators report to FracFocus. *See* Title 14, California Code of Regulations, Section 1788(b); North Dakota Administrative Code at 43-02-03-27.1(1)(g); HFRR_034643–44.  While Federal Defendants contend that review of ESA claims is limited to record review under the APA, *see* supra section VIII, Parties may cite extra-record evidence for the purposes of establishing or disproving standing.  *See Cent. Sierra Envtl. Res. Ctr. v. U.S. Forest Serv.*, 916 F. Supp. 2d 1078, 1086 (E.D. Cal. 2013) (*citing Nw. Envtl. Defense Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1527–28 (9th Cir. 1997); *Didrickson v. U.S. Dep't of Interior*, 982 F.2d 1332, 1340 (9th Cir. 1992)).

[9] In addition, the Trico gas field located in the Atwell Island area identified by Ms. Anderson has been depleted, and oil and gas activities are unlikely to occur there in the future.  *See* Ex. 4, Excerpts of California DOGGR Annual Reports of the State Oil and Gas Supervisor (2009) at 105 (indicating no producing wells and no estimated oil reserves) (attached to Ex. A).

---

1    in ways that restrict oil and gas operations, making it even more speculative that hydraulic

2    fracturing activities governed by the 2017 Rule will someday occur there.[10]  If the Court were to

3    predicate standing on this conjectural chain that at some point, a species of concern to Ms.

4    Anderson "will stumble across a project tract," and that the same tract will be developed by the

5    oil and gas operator who will hydraulically fracture a well in a way that harms Ms. Anderson's

6    interests, it "would be tantamount to eliminating the requirement of concrete, particularized

7    injury in fact." *Summers*, 555 U.S. at 496.

8           As discussed further below, similar problems exist with regard to the three ways that

9    Sierra Club asserts that the repeal of the 2015 rule harms its interest in listed species.  Moreover,

10   its arguments ignore the fact that additional site-specific protections are already in place in listed

11   species habitat, independent of the 2015 or 2017 Rules.  These protections further demonstrate

12   why Sierra Club has not, and cannot, trace its alleged ESA injury to the fact that 2015 Rule

13   contained these requirements.

14

15

16

17   ─────────────────────

18   [10] As the FWS has recognized, BLM's Bakersfield RMP delineates areas needed for the
     protection of, and to promote the recovery of, listed species.  *See* Ex. 5 at 9–10.  BLM has closed
19   149,000 acres of land to oil and gas operations in the Bakersfield RMP and placed special
     stipulations on another 1,0011,470 acres.  *See* Ex. 3 at 2.14.1.1.  Areas closed to oil and gas
20   operations, and therefore unaffected by either the 2015 or 2017 Rules, include the Bitter Creek
     Areas of Critical Environmental Concern ("ACEC"), Blue Ridge ACEC, Erskine Creek ACEC,
21   Piute Cypress ACEC, and Point Sal ACEC.  *Id.* at 2.14.1.1.  Areas with wilderness
     characteristics, segments of the Lower Kern River, North Fork of the Kaweah River, San Joaquin
22   River, and Chimney Creek determined to be suitable as Wild and Scenic Rivers, and Deer Spring
     area of ecological importance have also been closed to oil and gas activities.  *See id.* at 2.14.1.1;
23   Map 2.22.  Likewise, oil and gas activities have been limited to "valid existing rights" in the
     Carrizo Plain National Monument since 2001.  *See* Ex. 6, Proclamation, Establishment of the
24   Carrizo Plain National Monument (Jan. 17, 2001) (attached to Ex. A).  In general, National
     Wildlife Refuges are managed by FWS, rather than BLM, and FWS only allows the extraction or
25   development of minerals on National Wildlife Refuge lands if there is a valid existing right to
     engage in such activities.  *See* FWS, Mineral Management Policy 612 FW 1 (December 27,
26   2016), available at https://www.fws.gov/policy/612fw1.html#extractionsanddevelopment.

27

28

3. _Sierra Club Has Not Shown that Rescission of the 2015 Rule's Tank Requirements Caused Its Alleged ESA Injury_

Sierra Club argues that the 2017 Rule poses risks to wildlife by allowing the use of open pits, rather than closed tanks to store hydraulic fracturing wastewater, thus potentially exposing species to the fluids.  Sierra Club Mot. for Summ. J. ("Sierra Club Mot.") at 28, Case No. 4:18-cv-524-HSG, ECF No. 110.  To understand why the Sierra Club cannot show that its alleged injuries are caused by the 2017 Rule, it is necessary to understand the scope of the waste storage provision in the 2015 Rule, and the breadth of the protections for listed species that exist independent of either the 2015 or 2017 Rules.

First, the 2015 Rule included a provision that applied during the interim period (a maximum of 90 days) between "the completion of hydraulic fracturing and the implementation of a plan for the disposal of produced water approved under BLM regulations, which currently are in Onshore Order 7."  80 Fed. Reg. 16,162.  During this "interim period," fluids were to be stored in "rigid enclosed, covered, or netted and screened above-ground tanks."  80 Fed. Reg. at 16,220.  In limited circumstances, operators could apply for approval to use a lined pit.  _Id._ at 16,162.

Second, the 2017 Rule does not mandate the use of pits, or prevent BLM, or any state regulator or individual operator from deciding to use closed tanks in order to ensure compliance with the ESA.  _See Clapper_, 568 U.S. at 412 ("because § 1881a at most authorizes—but does not mandate or direct—the surveillance that respondents fear, respondents' allegations are necessarily conjectural").  Indeed, both California and North Dakota have passed regulations addressing the storage of fluids.  _See_ N.D. ADMIN. CODE § 43-02-03-19.3 (except for limited circumstances, "no saltwater, drilling mud, crude oil, waste oil, or other waste shall be stored in earthen pits or open receptacles."); CAL. FISH & GAME CODE § 1016; CAL. CODE REGS. tit. 14, § 740 (regulating any open depression or basin in the ground, whether manmade or natural, which contains oil or a combination of oil and water and poses a hazard to wildlife); _see also_ Ex. 5 at 9 (noting that "all operators [on BLM land] in California are required to comply with [California's]

DOGGR[11] regulations.  Currently, DOGGR has very stringent regulations for hydraulic fracturing, including but not limited to well construction, chemical disclosure, groundwater monitoring both before and after the operations are conducted, and others.").  In addition to these requirements, both BLM and the oil and gas operators have a strong incentive to ensure that their operations do not result in such harm because the ESA contains criminal penalties for anyone (including federal agencies) who "takes" a listed species.  *See* 16 U.S.C. § 1538.

Third, and relatedly, the areas that the Plaintiffs' declarations address are already subject to requirements wholly independent of the 2015 or 2017 Rules that provide protections for the listed species that they are concerned about.  After the 90-day interim period, BLM's legally-binding Onshore Order 7 requires that "[t]he pit shall be fenced or enclosed to prevent access by livestock, wildlife, and unauthorized personnel.  If necessary, the pit shall be equipped to deter entry by birds," 58 Fed. Reg. 47,354, 47,364 (Sept. 8, 1993), and that "[t]he pit shall be kept reasonably free from surface accumulation of liquid hydrocarbons that would retard evaporation," *id.* at 47,365.

In addition, oil and gas operations on BLM land in both the Bakersfield region and Fort Berthold are governed by additional requirements for listed species protection.  The BLM Bakersfield Field Office administers all oil and gas operations in accordance with the detailed instructions contained in a programmatic biological opinion issued by the FWS.  This includes requirements for the handling of potentially hazardous liquids to protect listed species: "operator will prevent avian and terrestrial animal access to fluids pits that contain or have the potential of containing salinity sufficient to cause harm, surfactants, or Resource Conservation and Recovery Act-exempt hazardous substances."  Ex. 5 at 13.[12]  BLM further requires that "Federally-listed

---

[11] California's Department of Division of Oil, Gas, and Geothermal Resources ("DOGGR") regulates hydraulic fracturing operations in the State of California.  These regulations also apply to operations on BLM land within the State.

[12] FWS previously issued programmatic biological opinions to the BLM relating to oil and gas activities over the same geographic area in 1996 and 2001.  Ex. 5 at 1.  The most recent

species and other animals shall be protected from the hazards posed by sumps.  All exposed oil sumps shall be screened or eliminated." *Id.*  BLM places specific requirements on the type of screening for any remaining sumps.  *Id.*  In addition, the operator must "take actions necessary to prevent wildlife and livestock access, including avian wildlife, to all open-topped tanks that contain or have the potential to contain salinity sufficient to cause harm to wildlife or livestock, hydrocarbons, or Resource Conservation and Recovery Act of 1976-exempt hazardous substances.  At a minimum, the operator will net, screen, or cover open-topped tanks to exclude wildlife and livestock and prevent mortality." *Id.*  "If the operator uses netting, the operator will cover and secure the open portion of the tank to prevent wildlife entry.  The operator will net, screen, or cover the tanks until the operator removes the tanks from the location or the tanks no longer contain substances that could be harmful to wildlife or livestock." *Id.*  Given the breadth of these protections—that exist wholly outside of either the 2015 or 2017 Rule—Sierra Club cannot trace its alleged injuries to the rescission of a regulatory provision that would have required the use of tanks during a period of time limited to a maximum of 90 days.

At Fort Berthold, regulation of oil and gas activities is shared between BLM and the BIA.[13]  *See* Ex. 7, BIA, Mitigated Programmatic Environmental Assessment Oil and Gas Development on Trust Lands and Minerals Fort Berthold Indian Reservation (May 2017) (attached to Ex. A).  Very little of the mineral estate on the Reservation is governed by BLM.

---

biological opinion was issued in 2017.  *Id.*  Pursuant to the ESA, BLM requested formal consultation on the effects of BLM-approved oil and gas activities on the San Joaquin kit fox, blunt-nosed leopard lizard, giant kangaroo rat, Tipton kangaroo rat, Kern mallow, San Joaquin wooly-threads, California jewelflower, and Bakersfield cactus.  *Id.*

[13] The Reservation includes surface lands and subsurface minerals owned by various entities, including the Three Affiliated Tribes, individual tribal members (allottees), and persons who are not members of tribes (fee lands).  Ex. 7 at 1.2.  The U.S. also owns water and shore areas of Lake Sakakawea within the Reservation.  *Id.*  The BIA has trust responsibilities regarding minerals and lands owned by the Three Affiliated Tribes and tribal allottees, and the BLM is responsible for permitting exploration and development of trust minerals.  *Id.*

*See* Ex. 8, Map showing mineral ownership on Fort Berthold Reservation (attached to Ex. A).[14]

Both BIA and BLM impose requirements on operators, including the use of closed loop systems

where all drilling fluids and solid wastes are contained in tanks.  *See* Ex. 9, Fort Berthold

Programmatic BA at 2.4.1, 2.10.2.2 (attached to Ex. A); Ex. 7 at 2.2.4.1, 2.5.3, 2.5.6.  As a result

of the BIA-imposed requirements and the North Dakota state regulations, there are no open pits

storing wastewater on the Reservation.  *See id.*; N.D. ADMIN. CODE § 43-02-03-19.3.

Therefore, Sierra Club cannot trace any ESA injury to the repeal of the 2015 Rule's 90-day

interim tank requirements.

      In support of its argument, Sierra Club cites a number of studies that are more than a

decade old indicating that uncovered waste storage pits can result in harms to wildlife.  *See* ECF

No. 110-2 at 6-65.  These studies are insufficient to demonstrate the 2017 Rule has caused either

a present or future injury to Plaintiffs.[15]  As discussed above, industry practices and agency

requirements have evolved since those studies were completed, so that uncovered pits are no

longer permissible when they pose risks to listed species.  As the newer agency documents that

Plaintiffs include demonstrate, federal agencies now place additional requirements, including

fencing, netting, or use of tanks to protect listed species.  *See, e.g.,* BLM, Record of Decision and

Approved Resource Management Plan for the Bakersfield Field Office (2014), ECF No. 110-2 at

85 ("All liquids shall be in closed, covered containers. Any spills of hydrocarbon/hazardous

liquids shall not be left unattended until clean-up has been completed. No open drilling mud,

water, oil or other liquid storage or retention structures will be allowed. All such structures will

---

[14] The map areas in yellow are governed by BLM. The Tribal and Allotted land (purple and green) are governed by BIA.  The areas shown in white do not fall under the jurisdiction of either agency and are not governed by the 2017 Rule.

[15] As further explained in Section VIII, the Court should not consider these studies when considering the merits of Plaintiffs' ESA claims because review of ESA claims is limited to the administrative record.  It may, however consider them for purposes of determining whether Plaintiffs have standing.  *See Cent. Sierra Envtl. Res. Ctr.*, 916 F. Supp. 2d at 1086.

1  be required to have some sort of netting or other covering that precludes entry or other use by

2  condors or other listed avian species."); BLM, Gunnison Sage-Grouse Rangewide Draft

3  Resource Management Plan Amendment and Draft Environmental Impact Statement (2016),

4  ECF No. 110-2 at 70 ("Cover (with fine mesh netting or other effective techniques) all drilling

5  and production pits and tanks regardless of size to reduce sage grouse mortality.").

6      Sierra Club notably lacks any recent support for its claim that listed species may be

7  affected in areas identified in the standing declarations, despite the fact that those areas are

8  presently subject to the 2017 Rule.  For the areas where Sierra Club expresses concern, it

9  presents no evidence of any listed species being harmed by an open pit since the promulgation of

10  the 2017 Rule.  Indeed, it cites to nothing in the Record, including in the materials filed through

11  public comment, to indicate that listed species face a present risk of harm from open pits during

12  the 90-day period that would have been regulated by the 2015 Rule.  By contrast, BLM records

13  during the time that the 2017 Rule has been in effect show that no species have been harmed by

14  oil and gas activities in the Bakersfield region.  Ex. 2, BLM, 2018 Annual Report for the

15  December 22, 2017 Programmatic Biological Opinion on Oil and Gas (December 20, 2018)

16  (attached to Ex. A).  *See Clapper*, 568 U.S. at 409 ("threatened injury must be certainly

17  impending to constitute injury in fact, and that [a]llegations of possible future injury are not

18  sufficient." (quotations and citations omitted)).

19

20      Essentially, the Sierra Club's theory rests on the following causal chain: (1) BLM has or

21  will authorize hydraulic fracturing in specific regions of California or North Dakota; (2) BLM

22  will not require the operators of these operations to use closed tanks to store waste fluid during

23  the 90-day interim period; (3) during that 90-day period, a listed species in which Sierra Club is

24  interested will wander onto the site; (4) the operator will fail to take measures necessary to

25  ensure that the listed species stays out of any waste pits; and (5) listed species will be harmed by

26  contact with the hydraulic fracturing waste fluid.  This chain is too attenuated to be cognizable

27  under Article III.  *See Clapper*, 568 U.S. at 410; *id.* at 413 (expressing reluctance "to endorse

28  standing theories that require guesswork as to how independent decisionmakers will exercise

1    their judgment."); *Lujan*, 504 U.S. at 562 (Plaintiff has the burden to "adduce facts" showing that

2    the "unfettered choices made by independent actors" "have been or will be made in such manner

3    as to produce causation and permit redressability of injury.").

4            4.    *Sierra Club Has Not Shown that Rescission of the 2015 Rule Caused an ESA*
                    *Injury from Surface and Groundwater Pollution*
5

6            Sierra Club also asserts that the 2015 Rule's well construction standards, and the use of

7    tanks instead of pits, provided additional protections to listed species.  Sierra Club Mot. at 29.

8    This claim likewise relies on far too speculative of a causal chain to be constitutionally

9    cognizable, and again ignores the existing protections in place where oil and gas activities have

10   the potential to harm listed species.  Specifically, Sierra Club asserts in its brief that "[m]any

11   ESA-listed species that coexist with BLM-authorized hydraulic fracturing rely on clean surface

12   and groundwater," Sierra Club Mot. at 29, and that "FWS and BLM have both acknowledged

13   that spills and accidents causing contamination of waters in the Upper Colorado River Basin can

14   kill and otherwise harm the listed fish and their aquatic habitat," *id.*  First, Sierra Club has not

15   provided any evidence that it has members who have a constitutionally cognizable interest in any

16   listed species of Colorado River fish.  The only standing declarations that it has provided that

17   profess *any* interest in listed species are limited to regions of California and the Fort Berthold

18   Indian Reservation in North Dakota; they do not mention any interest in any listed Colorado

19   River fish.  *See supra* section IV.B.1; Anderson Decl., ¶¶ 8-10, 12-15; Deville Decl, at 47.

20

21           Second, even if it did have a cognizable interest in these fish, Sierra Club never explains

22   how the 2017 Rule is causally linked to its injury.  In addition to the protections for species

23   described above in Section VI.B.3, BLM requires operators in the Bakersfield management area

24   to follow measures to ensure that species are not impacted by potential water pollution outlined

25   in the FWS biological opinion.  For example, operators must "prevent all hazardous, poisonous,

26   flammable, and toxic substances from coming into contact with soil and water."  Ex. 5 at 13.

27   This includes installing and maintaining an "impervious secondary containment system for any

28   tank or barrel containing hazardous, poisonous, flammable, or toxic substances sufficient to

1   contain the contents of the tank or barrel and any drips, leaks, and anticipated precipitation" as

2   well as maintaining "all secondary containment systems to prevent wildlife and livestock

3   exposure to harmful substances" and installing "effective wildlife and livestock exclosure

4   systems such as fencing, netting, expanded metal mesh, lids, and grate covers." *Id.* If a spill

5   does occur, any "released materials will be cleaned up immediately and disposed of properly."

6   *Id.* at 12. In the case of a release of potentially hazardous materials, including produced fluids,

7   within listed species habitat the operator must contact FWS and/or BLM "as soon as possible,

8   but not later than 24 hours after the release occurs or is discovered." *Id.* And within 48 hours of

9   being notified of a release that may affect listed species, BLM will issue additional clean-up

10   provisions to the operator, and, within 60 days of completing clean-up activities, a compliance

11   report will be submitted by the monitoring biologist to the BLM. *Id.*

12        At Fort Berthold, operators are required to follow BLM's Onshore Oil and Gas Order No.

13   2 in both BLM and BIA jurisdictional areas to ensure safeguards for the prevention of blowouts

14   and to maintain fluid control during drilling. *See* Ex. 10, Letter from FWS to BIA concurring

15   with BIA's determinations of the effect on species in the Programmatic Biological

16   Assessment/Biological Evaluation for Oil and Gas Development for Fort Berthold Indian

17   Reservation (June 4, 2014) at 3 (attached to Ex. A). In addition, well pads must be at least 150

18   feet from wetlands and perennial and intermittent streams, and have a 24-inch perimeter berm to

19   prevent contaminants from leaving the well pad in the event of a spill in BIA-regulated areas.

20   *Id.; see also* Ex. 9 BIA, Programmatic Biological Assessment/Biological Evaluation for Oil and

21   Gas Development for Fort Berthold Indian Reservation (2014) at 2.10.2.4 (noting additional

22   protections for water). BLM also requires at least 500 to 1,000 foot set-backs from water

23   sources, *see* Ex. 11, BLM, Oil and Gas Lease Stipulation 16-3 and places additional

24   requirements in specific APDs to protect against spills (attached to Ex. A). *See, e.g.*, Ex. 12,

25   BLM, Sample Appendix K Surface Conditions of Approval for Application for Permit to Drill

26   (attached to Ex. A).

27        As a result, before Plaintiffs could hypothetically suffer an injury from the rescission of

28

the 2015 Rule's extra requirements, a long list of speculative events would have to occur: (1) BLM would have to approve a permit for an operator in an area where a spill had the potential to enter into surface or groundwater used by a listed species in which Plaintiffs have an interest, (2) an accident would have to occur at the site, and that accident would have to be one that would have been prevented if the 2015 Rule was in effect; (3) the accident must also occur in such a way that it resulted in hazardous materials entering into the water in sufficient quantity that they resulted in harm to the listed species despite the requirements already in place.  This chain is too attenuated to be cognizable under Article III.  *Cf. Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't* of Navy, 383 F.3d 1082, 1092 (9th Cir. 2004) ("[W]e do not think that risks of missile explosion, based on any discretionary acts of the Navy, required additional ESA section 7 consultations because the likelihood of jeopardy is too remote.").

     5.   *Sierra Club Has Not Shown Any ESA Injury from Rescission of the 2015 Rule's Water Source and Volume Disclosure Requirements*

Finally, Sierra Club alleges that "water depletions associated with BLM-approved hydraulic fracturing operations adversely impact listed species and their habitat"—and points to Colorado River fish as examples of listed species that could be harmed.  Sierra Club Mot. at 29. It claims that the never-implemented 2015 Rule would have prevented this harm by disclosing the source of water used in hydraulic fracturing operations.  *Id.*

As noted above, Sierra Club has not provided any evidence that it has members who have a constitutionally cognizable interest in any listed species of Colorado River fish.  Even if Sierra Club had an interest in listed Colorado River fish, it cannot demonstrate how the 2015 Rule's disclosure requirement would prevent water depletions, or how the 2017 Rule causes any injury to the fish.  This is particularly true because BLM already has protections in place independent of either the 2015 or 2017 Rule to prevent harm to the listed Colorado River fish from water withdrawals.

Specifically, BLM engaged in consultation with FWS on its Fluid Minerals Program in the South Platte River Basin, which resulted in a programmatic biological opinion which

includes specific measures that BLM implements to ensure that water withdrawal do not harm listed fish species. *See* Ex. 13, FWS, Formal Section 7 Consultation for BLM's Fluid Minerals Program in the [South] Platte River Basin, Colorado (Feb. 2, 2015) (attached to Ex. A). On a project-by-project basis, BLM assesses whether or not the operator will use a water source that is a tributary to the South Platte River. If the operator commits to using a source that the state deems non-tributary, such as water from a designated groundwater basin that is not hydrologically connected to the South Platte, then river flows will not be affected. *See* Ex. 14, BLM Letter to Operators (March 2, 2015) at 2 (attached to Ex. A) (Before BLM approves an APD, energy companies must certify that "100% of the water that will be used in construction, drilling and completion activities is designated non-tributary to the South Platte River by the State of Colorado . . . disclose the source of the water supply, and provide a copy of the well permit or water right that shows that the water is designated non-tributary."). In addition, the operator will likely be required to "prepare a biological assessment on the effect of water depletion resulting from construction, drilling and completion activities in the South Platte Basin on federally listed species whose habitat is dependent on water in the South Platte in Nebraska." *Id.* BLM also requires operators to "replace any water used from oil and gas development that may affect" listed species. Ex. 14, BLM, Endangered Species Act Section 7 Consultation on Water Depletions Caused by Oil and Gas Activity in Platte River Basin in Colorado (Jan. 9, 2015).

  Ms. Deville is the only declarant to raise concerns about how water withdrawals may impact listed species. *See* Deville Dec. ¶ 26 ("But I know that there are many endangered species that could be threatened by spills and other pollution or water depletion associated with hydraulic fracturing here on Fort Berthold, including the Dakota skipper."). First, BLM only controls the mineral estate in a very limited portion of the Fort Berthold reservation. *See* Ex. 8. Second, in a programmatic biological evaluation for Fort Berthold Indian Reservation Oil and Gas Development, FWS explained the limited impact of the possible water withdrawals by oil and gas activities: "While water management will always be a concern to the management of

1   Lake Sakakawea . . . if water is drawn from Lake Sakakawea directly or from water wells

2   hydrologically connected to the reservoir, the Proposed [oil and gas] Action would use

3   approximately 0.04 percent of the volume of the lake."  Ex. 9 at 5.4.1.  Third, Sierra Club has not

4   demonstrated that water withdrawals would cause injury to species in which Ms. Deville is

5   interested.  *See* Ex. 10 (noting that [t]he greatest potential stressor for the Dakota skipper from

6   the proposed action is destruction and degradation of habitat" rather than any issues subject to

7   additional regulations under the 2015 Rule such as water pollution or depletion as well as noting

8   water protections in place for the Pallid Sturgeon).  As a result, Plaintiffs' alleged injury is not

9   fairly traceable to the 2017 Rule.

10          Nor would any purported injury be redressed even if the 2015 Rule was in effect.  *See*

11  *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 75 n.20 (1978) (plaintiff

12  must show a "substantial likelihood" that the alleged injury will be redressed by the relief it

13  seeks).  The only difference between the 2015 Rule and the 2017 Rule identified by Plaintiffs is

14  that the 2015 Rule required disclosure of the source of water used.  Sierra Club Mot. at 28–29.

15  As noted above, operators are *already* required to disclose the source of the water used in the

16  areas that Sierra Club professes to be interested in.  *Id.* at 29.  In addition, Sierra Club fails to

17  explain how the mere disclosure of source of the water would prevent any water withdrawal and

18  therefore have an impact on listed species.  As a result, vacatur of the 2017 Rule would not

19  redress its alleged injury.

20

21          **C.  California Lacks Standing Because It Asserts Parens Patriae Injuries, Not**
            **Direct Harms**

22

23          It is settled law that a "State does not have standing as parens patriae to bring an action

24  against the Federal Government."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458

25  U.S. 592, 610 n.16 (1982) (citing *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923));

26  *accord Nevada v. Burford*, 918 F.2d 854, 858 (9th Cir. 1990) (relying on "the Supreme Court's

27  clear statement in *Snapp*"); *Alaska v. United States*, 981 F.2d 1259 (9th Cir. 1992) (same);

28  *People ex rel. Lockyer v. U.S. Dep't of Agric.*, No. CIV.A05-0211 MCE GGH, 2005 WL

1719892, at *2 (E.D. Cal. July 18, 2005).  As the D.C. Circuit has recently explained, this longstanding principle remains true even after *Massachusetts v. EPA*, 549 U.S. 497 (2007), because there the Supreme Court concluded that the state had standing based on an injury to the state's proprietary interest as a landowner.  *See Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 178–83 (D.C. Cir. 2019); *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 475–79 (D.C. Cir. 2009).  Likewise, California does not have standing to sue the U.S. based on the generalized interests of its citizens.

In a very similar situation, the Eastern District of California held that California lacked standing to sue the U.S. Department of Agriculture for alleged failures to comply with NEPA and the APA in creating the 2004 Sierra Nevada Forest Plan Amendment.  *People ex rel. Lockyer*, 2005 WL 1719892, at *1.  The court first explained that the state had not asserted any particular injuries to California itself, outside of its general interests in the health and welfare of its citizens.  *Id.* at *2–3.  The *Lockyer* court dismissed the case, explaining that such generalized allegations are "insufficient to state a cognizable claim against the federal government.  In actions regarding citizens' rights relating to the federal government, it is the United States, not an individual state, that represents citizens as parens patriae*."  Id*. at *3.[16]

Here, California has similarly failed to assert direct injuries to California outside of the interests of its citizens.  California's Complaint states:

> The Attorney General is the chief law enforcement officer of the State and has the authority to file civil actions in order to protect public rights and interests, including actions to protect the natural resources of the State.  Cal. Const., art. V, § 13; Cal. Gov. Code §§ 12600-12612.  This challenge is brought in part pursuant

---

[16] Even assuming that parens patriae standing is available to California, the State has not met its burden for invoking it because there exists here "a small group of citizens who are likely to challenge the [government action] directly."  *Maryland v. Louisiana*, 451 U.S. 725, 739 (1981) (holding that a state may rely on parens patriae standing and "act as the representative of its citizens in original actions where the injury alleged affects the general population of a State in a substantial way").

1          to the Attorney General's independent constitutional, statutory, and common law
2          authority to represent the public interest.

3    Cal. Compl. ¶ 10.  While California notes that the state contains millions of acres of BLM land

4    and subsurface mineral estate, *id.* ¶ 11, it does not "allege any injuries that such activities would

5    cause to the land, resources, and wildlife owned, used, and managed by the State." *Lockyer*,

6    2005 WL 1719892, at *3.  *See also* Cal. Compl. ¶ 12 ("California has a strong interest in

7    preventing the adverse environmental and public health impacts from the use of hydraulic

8    fracturing on federal and Indian lands within the State."), ¶ 14 ("Plaintiff has an interest in the

9    protection of federal lands, which belong to the People."), ¶ 15 ("Defendants' action will

10   adversely impact Plaintiff by increasing the potential for harmful environmental and public

11   health impacts."); Cal. Mot. for Summ. J. ("Cal. Mot.") at 13 ("Thus, the Repeal will adversely

12   impact California by increasing the risks of harmful environmental and public health impacts

13   from conducting hydraulic fracturing on federal and Indian lands, including increased air

14   pollution, impacts to surface and groundwater resources, and induced seismicity from the

15   disposal of wastewater in disposal wells from hydraulic fracturing operations.").

16         Moreover, the State has failed to provide any evidence to indicate that it has suffered a

17   legally cognizable injury separate and apart from the generalized interest of its citizens.

18   Plaintiffs have the burden of establishing standing for each claim raised in the complaint.  *See*

19   *Valley Outdoor, Inc. v. City of Riverside*, 446 F.3d 948, 952 (9th Cir. 2006); *Schmier*, 279 F.3d

20   817, 821 (9th Cir. 2002).  At the summary judgment phase, Plaintiffs "can no longer rest on such

21   mere allegations, but must 'set forth' by affidavit or other evidence specific facts, Fed. Rule Civ.

22   Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true."

23   *Lujan*, 504 U.S. at 561 (quotations omitted).  "It is a long-settled principle that standing cannot

24   be inferred argumentatively from averments in the pleadings, but rather must affirmatively

25   appear in the record." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990), *holding*

26   *modified by City of Littleton, Colo. v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774 (2004) (citations

27   omitted); *Wyoming v. Oklahoma*, 502 U.S. 437, 448-49 (1992); *see also, Gov't of Manitoba*, 923

F.3d at 178 (contrasting direct injury and parens patriae standing). Here, California filed no declarations supporting its claim of direct injury, as it must at the summary judgment stage. *See Lujan* 504 U.S. at 561 (1992). This lack of evidence distinguishes this case from the Ninth Circuit's finding that a state had established standing based on its proprietary interests in the state's natural resources. *See Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178–79 (9th Cir. 2011). In that case, the court specifically noted that California had submitted an affidavit to support its unique propriety interest and explaining the future harm that the State would suffer from the proposed rule. *Id.* Here, California has not submitted any such affidavits, and instead cites to its own comment letter to BLM, Cal. Mot. at 13 (citing HFRR_005056–57), and to a report by California's DOGGR of oil and gas activities apparently under the State's own regulatory purview. *See* Cal. Mot. at 13.[17] These documents do not indicate how the 2017 Rule harms California's unique propriety interest. California has thus failed to meet its burden of demonstrating any direct injury to its own interests.

Because California does not have standing to sue the U.S. in parens patriae, and has not established a direct injury, its suit must be dismissed.

### D.  California Lacks Standing to Bring IMLA Claims

California lacks standing to make claims and arguments under the Indian Mineral Leasing Act ("IMLA").[18] California brings an IMLA claim alleging that the IMLA "provides

---

[17] Notably, the report opens by explaining that "[i]n September 2013, Governor Brown signed into law Senate Bill 4 SB 4), establishing the *most comprehensive Well Stimulation Treatment (WST) regulatory program in the United States*." HFRR_023336 (emphasis added). Except in rare instances of federal preemption, state laws and regulations also apply on BLM lands within that state.

[18] These two cases are separate, even though the parties are managing them jointly. Thus the law providing that "[o]nly one of the [plaintiffs] needs to have standing" to bring a claim does not allow California to bring IMLA claims in *California v. Bureau of Land Management*, regardless of whether Sierra Club can bring those claims in *Sierra Club v. Bernhardt. Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007).

1    Defendants with a trust responsibility to ensure that '[a]ll operations under any oil, gas, or other

2    mineral lease issued pursuant to the terms of [the IMLA] or any other Act affecting restricted

3    Indian lands shall be subject to the rules and regulations promulgated by the Secretary of the

4    Interior.'"  Cal. Compl. ¶ 55 (quoting 25 U.S.C. § 396d).  California claims that Federal

5    Defendants violated the IMLA by acting in a manner that was arbitrary, capricious, an abuse of

6    discretion, not in accordance with law, and in excess of their statutory authority.  *Id.* ¶ 58.

7    Because California is outside the IMLA's zone of interest, its claim under that statute must be

8    dismissed.

9         "[S]tanding is not dispensed in gross," and "a plaintiff must demonstrate standing for

10    each claim he seeks to press and for each form of relief that is sought."  *Town of Chester, N.Y. v.*

11    *Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quoting *Davis v. Fed. Election Comm'n*, 554

12    U.S. 724, 734 (2008)).  The APA "grants standing to a person 'aggrieved by agency action

13    within the meaning of a relevant statute.'"  *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 394 (1987)

14    (quoting 5 U.S.C. § 702).  The "zone of interest" test is a guide for deciding whether a particular

15    plaintiff should be heard to complain of a particular agency decision.  *Id.* at 399.  "In cases where

16    the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of

17    review if the plaintiff's interests are so marginally related to or inconsistent with the purposes

18    implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the

19    suit."  *Id.* at 399–400.

20         California is well outside the zone of interests that Congress intended the IMLA to

21    protect and, therefore, it lacks standing to bring those claims.  The IMLA "imposes extensive

22    responsibilities on the government in tribal mineral leasing matters for the benefit of Indians."

23    *Assiniboine & Sioux Tribes of Fort Peck Indian Reservation v. Bd. of Oil & Gas Conservation of*

24    *State of Montana*, 792 F.2d 782, 794 (9th Cir. 1986).  "[T]he IMLA aimed to foster tribal self-

1   determination by 'giv[ing] Indians a greater say in the use and disposition of the resources found

2   on Indian lands.'" *United States v. Navajo Nation*, 537 U.S. 488, 493–94 (2003) (quoting *BHP*

3   *Minerals Int'l Inc.*, 139 I.B.L.A. 269, 311 (1997)).

4        Several Circuits have held that nontribal entities lack standing to bring IMLA claims.

5   The Eighth Circuit has held that a nontribal lessee of Indian land lacked standing to sue the

6   Secretary of the Interior under the IMLA because Congress intended the IMLA "to protect only

7   Native American interests." *Rosebud Sioux Tribe v. McDivitt*, 286 F.3d 1031, 1036–37 (8th Cir.

8   2002). The Eleventh Circuit agreed, concluding that the IMLA and its accompanying

9   regulations "protect Indian landowners, not nontribal lessees." *Hollywood Mobile Estates, Ltd.*

10  *v. Seminole Tribe of Fla.*, 641 F.3d 1259, 1270 (11th Cir. 2011); *see also Chuska Energy Co. v.*

11  *Mobil Expl. & Producing N. Am., Inc.*, 854 F.2d 727, 732 (5th Cir. 1988) ("That the Navajos or

12  the Secretary of the Interior could have standing in federal court to challenge the assignment

13  [under the IMLA] does not confer a similar right on non-tribal or non-governmental litigants

14  whom it was not designed to protect."); *cf. San Xavier Dev. Auth. v. Charles*, 237 F.3d 1149,

15  1153 (9th Cir. 2001) ("[A] non-Indian party to a contract does not have the right to employ

16  statutory remedies enacted to protect Indian tribes and their members."). That reasoning applies

17  to California's IMLA claim: it lacks standing to bring that claim because the IMLA was not

18  intended to protect states.

19

20        Furthermore, California has not shown that it has any relevant regulatory authority—any

21  environmental protection role—over tribal lands. There is a "'deeply rooted' policy in our

22  Nation's history of 'leaving Indians free from state jurisdiction and control.'" *Okla. Tax*

23  *Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 123 (1993) (quoting *McClanahan v. State Tax*

24  *Comm'n of Ariz.*, 411 U.S., 164, 168 (1973)). "Generally speaking, primary jurisdiction over

25  land that is Indian country rests with the Federal Government and the Indian tribe inhabiting it,

26  and not with the States." *Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 531 n.1

27  (1998). States lack authority to enforce civil laws and regulations on tribal lands. *California v.*

28  *Cabazon Band of Mission Indians*, 480 U.S. 202, 209 (1987); *see also* 80 Fed. Reg. 16,128,

1    16,133 (Mar. 26, 2015) ("[S]tates . . . do not have trust responsibilities for Indian lands under

2    Federal laws.").  Accordingly, California has no standing to bring IMLA claims.[19]

3    ## V.   The 2017 Rule Satisfied the APA's Requirements

4           The APA standard of review is no more stringent when an agency changes its position

5    than in any other context.  *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009)

6    ("We find no basis in the [APA] or in our opinions for a requirement that all agency change be

7    subjected to more searching review.").  An agency must "display awareness" that it is changing

8    position and "show that there are good reasons for the new policy."  *Id.* at 515.  But an agency

9    "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than

10   the reasons for the old one; it suffices that the new policy is permissible under the statute, that

11   there are good reasons for it, and that the agency *believes* it to be better, which the conscious

12   change of course adequately indicates."  *Id.*  When an agency's "new policy rests upon factual

13   findings that contradict those which underlay its prior policy," it must provide a "detailed

14   justification" for its change in position.  *Id.*

15          BLM satisfied the requirements for changing its position.  First, it clearly displayed

16   awareness that it was changing its position, acknowledging that it was rescinding the 2015 Rule.

17   *See*, *e.g.*, 82 Fed. Reg. 61,926.  Second, it clearly "believe[d] that the 2017 Rule was "better"

18   than the 2015 Rule "because it decided to adopt it."  *Organized Vill. of Kake v. U.S. Dep't of*

19   *Agric.*, 795 F.3d 956, 967 (9th Cir. 2015).  Third, the 2017 Rule is "legally permissible."  *Id. at*

20   966.  And finally, BLM provided "good reasons" and a detailed explanation for promulgating the

21   2015 Rule.  *Id.*  The third and fourth points warrant further discussion below.

22          ### A.  The 2017 Rule Is Legally Permissible

23          Sierra Club argues that the 2017 Rule violates BLM's legal obligations under the Federal

---

[19] In any event, there is no oil and gas development on federally-managed tribal lands in California.  HFRR_034621 (listing all oil and gas operations between 2010 and 2017 on tribal lands, all of which are outside of California).

1   Land Policy and Management Act ("FLPMA"), the Mineral Leasing Act ("MLA"), the Indian

2   Mineral Development Act ("IMDA"), and the IMLA.  Sierra Club Mot. 19–22.  On the contrary,

3   BLM had no statutory obligation to promulgate the 2015 Rule—and, consequently, no statutory

4   obligation to keep that Rule in place.

5        None of those statutes has any provision mandating that the agency "shall promulgate"

6   hydraulic fracturing regulations.  The MLA authorizes BLM to "prescribe necessary and proper

7   rules and regulations," as well as "to do any and all things necessary to carry out and accomplish

8   the purposes" of the Act.  30 U.S.C. § 189.  The MLA further requires that "[e]ach lease shall

9   contain provisions for the purpose of ensuring the exercise of reasonable diligence, skill, and

10  care in the operation of said property" and "such other provisions as [the Secretary] may deem

11  necessary . . . for the safeguarding of the public welfare."  *Id.* § 187.  The IMLA and IMDA

12  similarly subject oil and gas "operations" on Indian lands "to the rules and regulations

13  promulgated by the Secretary."  25 U.S.C. § 396d; *see also id.* §§ 396, 2107.  These three

14  statutes do not require BLM to promulgate hydraulic fracturing regulations.

15       Nor does FLPMA.  FLPMA provides that "the Secretary shall . . . regulate, through

16  easements, permits, leases, licenses, published rules, or other instruments as the Secretary deems

17  appropriate, the use, occupancy, and development of the public lands."  43 U.S.C. § 1732(b).  It

18  further states that "[i]n managing the public lands the Secretary shall, by regulation or otherwise,

19  take any action necessary to prevent unnecessary or undue degradation of the lands."  43 U.S.C.

20  § 1732(b).  In fact, FLPMA gives the Secretary discretion—as evidenced by the "as the

21  Secretary deems appropriate" language—to manage public lands via various methods, including

22  permits, leases, or rules.  Its "broad wording . . . does not mandate that the BLM adopt

23  restrictions" or regulations regarding hydraulic fracturing.  *Gardner v. Bureau of Land Mgmt.*

24  638 F.3d 1217, 1222 (9th Cir. 2011).

25       When Congress requires an agency to promulgate regulations on a particular topic, it says

26  so clearly.  *See*, *e.g.*, 30 U.S.C. § 871 ("Each coal mine shall be provided with suitable

27  firefighting equipment. . . .  The Secretary [of Labor] shall establish minimum requirements for

28

1   the type, quality, and quantity of such equipment."); 15 U.S.C. § 78 (c)(3) (SEC shall by rule or

2   regulation establish minimum financial responsibility requirements for brokers and dealers);

3   *Envtl. Def. Fund, Inc. v. Gorsuch*, 713 F.2d 802, 804 (D.C. Cir. 1983) (Resource Conservation

4   and Recovery Act "required the [EPA] to promulgate regulations establishing standards for the

5   generation, transportation, treatment, storage, and disposal of hazardous waste within eighteen

6   (18) months of its enactment" (citing 42 U.S.C. §§ 6922–6924)); *Pub. Citizen v. NRC*, 901 F.2d

7   147, 148 (D.C. Cir. 1990) ("[T]he United States Nuclear Regulatory Commission must

8   promulgate mandatory instructional requirements for the personnel training programs of civilian

9   nuclear powerplant licensees"). The 2017 Rule simply does not violate any statute mandating

10  that BLM must promulgate a regulation governing hydraulic fracturing. 82 Fed. Reg. 61,935.

11      In the same vein, no statute requires that all federal and Indian lands be subject to the

12  same set of regulations. BLM promulgated the 2015 Rule because, at the time, it believed "the

13  agency need[ed] a baseline set of standards that would apply to Federal and Indian oil and gas

14  leases in all states." 80 Fed. Reg. 16,190. However, no statute requires BLM to regulate

15  hydraulic fracturing on federal and Indian lands, and no statute requires BLM to have a

16  consistent regulatory baseline for all federal and Indian lands nationwide. The 2017 Rule is

17  therefore legally permissible.

18      In addition, the MLA specifically contemplates that state laws will play a role in

19  regulation of federal lands. It mandates that lease provisions may not "be in conflict with the

20  laws of the State in which the leased property is situated," 30 U.S.C. § 187, and that "[n]othing"

21  in the MLA "shall be construed or held to affect the rights of the States or other local authority to

22  exercise any rights which they may have," 30 U.S.C. § 189.

23      Sierra Club argues that the 2017 Rule unlawfully delegates BLM's duties under FLPMA,

24  the MLA, and the IMLA, but the 2017 Rule does not constitute a delegation, much less an

25  unlawful delegation. Sierra Club Mot. at 23; *see also* Cal. Mot. at 20. BLM did not, by any

26  means, abdicate its obligation to oversee oil and gas development on federal and Indian lands.

27  To the contrary, as explained above, BLM still develops RMPs and, where appropriate, issues

28

leases and approves APDs subject to all requirements that BLM deems appropriate.  Moreover, BLM still maintains and enforces oil and gas regulations, including 43 C.F.R. subpart 3162 and Onshore Oil and Gas Orders 1, 2, and 7, which mandate requirements for well permitting; construction, casing, and cementing; and disposal of produced water.  The 2017 Rule does not delegate those responsibilities to states or tribes.  And while it is true that the MLA and other statutes afford BLM discretion to take regulatory steps beyond those outlined above, they do not require it.  A delegation occurs when an agency allows another entity to determine statutory compliance or abdicates its reviewing authority.  *Fund for Animals v. Kempthorne*, 538 F.3d 124, 133 (2d Cir. 2008).  The 2017 Rule does no such thing.  Instead of delegating its authority, BLM simply chose not to occupy a discretionary regulatory space.  And while BLM previously took the position that the 2015 Rule was "necessary" because BLM cannot delegate to states and tribes its statutory responsibilities, 80 Fed. Reg. 16,190, 16,133, BLM has more than adequately explained its change in position.

Sierra Club relies heavily on *Assiniboine & Sioux Tribes of Fort Peck Indian Reservation v. Bd. of Oil & Gas Conservation of State of Montana*, 792 F.2d 782, 795 (9th Cir. 1986), *e.g.*, Sierra Club Mot. at 23, which in fact illustrates that the 2017 Rule is not a delegation of authority.  *Assinboine* involved a cooperative agreement between BLM and the State of Montana holding that the Montana Board of Oil and Gas Conservation could issue recommendations and even make decisions regarding management of tribal lands.  The Ninth Circuit explained that if BLM was approving Montana State Board orders "without meaningful independent review, then its procedures would constitute an unlawful delegation of authority."  *Id.*  In stark contrast, here BLM has not surrendered any of its authority to issue leases and approve APDs, and the 2017 Rule does not "rubber stamp[]" any drilling decisions on federal and Indian lands.  *Assiniboine*, 792 F.2d at 789.

### B.  BLM Had "Good Reasons" and a Detailed Justification for the 2017 Rule

BLM had good reasons for promulgating the 2017 Rule:  it wanted to reduce and

1    eliminate unnecessary regulatory requirements.  82 Fed. Reg. 61,926.  BLM followed "this

2    Administration's policy to reduce unnecessary regulatory burdens on energy development."  82

3    Fed. Reg. 61,924.  That reason is "entirely rational."  *Fox Television Stations, Inc.*, 556 U.S. at

4    517.  BLM also provided a detailed justification—describing developments in state and tribal

5    regulations and industry guidance, BLM's pre-existing regulations, and its thorough cost-benefit

6    analysis—to support its good reasons.

7              1.  *Developments in State and Tribal Regulations and Industry Guidance*

8         When the 2015 rule was issued, 20 of the 32 states with Federal oil and gas leases had

9    regulations addressing hydraulic fracturing.  Since the promulgation of the 2015 rule, an

10   additional 12 states updated or finalized regulations addressing hydraulic fracturing.  82 Fed.

11   Reg. 61,925, HFRR_034640, HFRR_000151.  Thus, by the time BLM promulgated the 2017

12   Rule, every state in which federal oil and gas leasing occurred had hydraulic fracturing

13   regulations.  HFRR_000151.  Moreover, some tribes had taken steps to regulate oil and gas

14   development, and DOI encourages tribes to exercise their sovereignty over their lands and

15   mineral resources.  HFRR_000151, HFRR_034646–47.

16        Some states that already had regulations before 2015 strengthened them.  For example,

17   since 2015, North Dakota updated its regulations to require closed rigid tanks for fluids that flow

18   back after a well is hydraulically fractured and New Mexico required companies to disclose

19   chemicals to FracFocus.  HFRR_034642.

20        In addition, BLM believed that the 2015 Rule's requirement to disclose the chemicals in

21   fracturing fluids was unnecessary because disclosure to state regulatory agencies and databases

22   such as FracFocus was more prevalent in 2017 than it was in 2015.  82 Fed. Reg. 61,925–26.

23   For example, before 2015, only 20 states required operators to use FracFocus, but, by 2017, that

24   number had risen to 25.  HFRR_000316, D0IAR0020255, HFRR_034651–52.[20]

25

26   ───────────────

27   [20] California suggests that BLM wanted to rescind the 2015 Rule before it finished reviewing

28

1    Aside from the changes in state and tribal regulations, the American Petroleum Institute

2    updated two guidance documents for operators after BLM published the 2015 Rule.

3    HFRR_000174–75.  The updated guidance documents addressed many of the same topics—such

4    as cement monitoring, pressure testing well casing, and isolating producing zones—that the 2015

5    Rule addressed.  *Id.*  They also specified that operators should maintain information about site

6    design, additives used, additives stored on site, spills, and volume and sources of produced

7    water.  HFRR_034630.  BLM noted that API guidance documents are highly influential,

8    although BLM acknowledged that it lacked data about the percentage of operators that comply

9    with those documents.  *Id.*  BLM reasonably anticipated that operators typically would follow

10   industry recommended practices.  HFRR_034631.  For example, industry guidance recommends

11   that operators monitor cementing operations and, thus, BLM concluded that operators would

12   monitor cementing operations regardless of whether the 2015 Rule was in place.

13   HFRR_034648; HFRR_092046 (noting that some companies have voluntarily exceeded

14   regulatory requirements).  In short, after BLM promulgated the 2015 Rule, both the regulatory

15   landscape and industry guidance changed, leading BLM to conclude that the 2015 Rule was

16   unnecessary.

17

18            2.   *BLM's Pre-Existing Regulations*

19           BLM also concluded that its pre-existing regulations, including those located at 43 C.F.R.

20   subpart 3162 and Onshore Oil and Gas Orders 1, 2, and 7, adequately ensured that operators

21   conduct oil and gas operations in an environmentally sound manner.  82 Fed. Reg. 61,926.

22   While Plaintiffs complain that these pre-existing rules are outdated, the rules in fact address

23

24   ——————————————————

25   state regulations, Cal. Mot. at 17 n.5, but, even if that suggestion were true, the APA allows an
     administration to have policy preferences before completing its analysis.  *Dep't of Commerce v.*

26   *New York*, 139 S. Ct. 2551 (2019) ("It is hardly improper for an agency head to come into office
     with policy preferences and ideas . . . and work with staff attorneys to substantiate the legal basis

27   for a preferred policy.").

28

many of the same issues that the 2015 Rule addressed.  Onshore Order No. 2, for example, has long mandated the same the definition of "usable water" as the 2015 Rule.  It defines usable water as those waters containing up to 10,000 ppm of total dissolved solids and requires operators to using casing and cement to protect all usable water zones.  HFRR_034614.  Thus, while it is true that the 2015 Rule revised 43 C.F.R. § 3162.5-2(d) by defining usable water to include waters containing up to 10,000 ppm instead of 5,000 ppm, this was not a substantive change: "The requirement to protect and/or isolate usable water generally containing up to 10,000 ppm of TDS has been in effect since 1988, when Onshore Order 2 became effective."  80 Fed. Reg. 16,141.  BLM thus reasonably concluded that this portion of the 2015 Rule was unnecessary.  HFRR_034647.

Onshore Order 2 further requires that operators take remedial steps if the cement does not circulate back to the surface (an indication of well integrity) or if pressure tests indicate that the casing strings do not satisfy minimum standards.  HFRR_034648.  BLM concluded that operators would remedy inadequate cementing to protect their investments, follow industry recommended practices, and comply with state regulations and Onshore Order 2. HFRR_034649.  For example, 10 of 11 states that BLM surveyed require operators to test well casings to ensure they can handle pressures from hydraulic fracturing (and the eleventh state may require testing).  HFRR_034650.  BLM may also require cement logs and reports as conditions of approving drilling permits.  HFRR_034648.  BLM thus concluded that there would be no impacts from removing the 2015 Rule's cement evaluation log and mechanical integrity test requirements.  HFRR_034650.

### 3.  *Cost-Benefit Analysis*

BLM conducted a thorough cost-benefit analysis and concluded that any incremental benefits of the 2015 Rule had been eliminated by existing and improved state and federal regulations and industry guidance, thus making the 2015 Rule's burdens unnecessary. HFRR_034612.

1    The 2017 Rule reduced compliance costs by $9,690 per well or $14 to 34 million per year

2    on federal lands from 2018 to 2027.[21]  HFRR_034607, HFRR_034664.  On Indian lands, the

3    2017 Rule reduced compliance costs by $1.6 to $3.8 million per year.  HFRR_034657.  This

4    savings represents 0.1 to 0.2% of the cost of drilling a well, and up to 1.4% for wells with high

5    volumes of recovered fluid.  HFRR_034607.  The cost savings impacted 1,500 to 3,500

6    hydraulic fracturing operations per year.  HFRR_034655.

7    The 2017 Rule also saved time for operators and BLM.  For example, the 2015 Rule

8    would have required an additional eight hours of industry time to submit and four hours of BLM

9    time to process applications to conduct fracturing operations and an additional nine hours of

10   industry time to submit and 4.5 hours of BLM time to process notices after fracturing operations

11   were complete.  HFRR_034646–47.  BLM also concluded that rescinding the 2017 Rule would

12   reduce regulatory burdens because operators would be subject to only one set of regulations (i.e.,

13   state or tribal regulations), not two sets (i.e., state or tribal regulations, plus federal).

14   HFRR_003507.

15

16   California contends that BLM contradicted its prior finding in 2015 that the 2015 Rule's

17   compliance costs would be minimal.  Cal. Mot. at 19.  To the contrary, however, BLM

18   acknowledged that the cost savings would be "a small percentage of the cost of a well."  82 Fed.

19   Reg. 61,924.  BLM acknowledged that the cost savings were small, but it still chose to prioritize

20   those savings, as it is entitled to do.  BLM "was entitled in [2017] to give more weight to

21   socioeconomic concerns than it had in [2015]."  *Organized Vill. of Kake*, 795 F.3d at 968.

22   BLM concluded that the cost savings in the 2017 Rule exceeded the foregone benefits of

23   the 2015 Rule, HFRR_034658, particularly because BLM never quantified the 2015 Rule's

24   _____

25   [21] The figure of $9,690 in compliance cost savings differs from BLM's estimate of $11,400 in

26   compliance costs when it published the 2015 Rule because baseline conditions, including
     changes in oil and gas drilling activity, had changed since 2015.  HFRR_034655–56.

27   Furthermore, states had more regulations in 2017 than they did in 2015, which reduced the
     savings since operators would have to comply with the new state regulations.  HFRR_034655.

28

benefits when it was promulgating the 2015 Rule, HFRR_023925.  BLM acknowledged that the cost savings were unlikely to substantially alter operators' investment or employment decisions or affect the supply, distribution, or use of energy.  HFRR_034662.

California contends that BLM did not consider the 2015 Rule's benefits, Cal. Mot. at 21, but BLM acknowledged the benefits of the 2015 Rule that would be lost with the 2017 Rule, HFRR_034657.  For example, BLM appropriately acknowledged that the 2015 Rule reduced risks associated with hydraulic fracturing operations, reduced risks to surface and groundwater resources, and increased public awareness of the nature of hydraulic fracturing operations, including the chemicals used.  *Id*.  BLM also recognized that rescinding the 2015 Rule would leave the regulated community without a regulatory baseline across all federal lands given the variability in state regulations.  Nonetheless, BLM reasonably concluded that other federal and state regulations could offset some of the foregone benefits, HFRR_034658, and that the cost savings of the 2017 Rule exceeded the foregone benefits of the 2015 Rule, even though the 2015 Rule's "costs [we]re a small percentage of the cost of a well."  82 Fed. Reg. 61,924, HFRR_034658.

As with any analysis, BLM acknowledged the uncertainties in its cost-benefit analysis. *See Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1109 (9th Cir. 2016) (upholding agency's analysis where agency "clearly explained the assumptions on which it built the model and the uncertainties inherent in it, thereby identifying the model's limitations").  For example, it noted that the number of hydraulic fracturing operations could vary in the future, which could impact the accuracy of the cost-benefit analysis.  HFRR_034654.  In addition, BLM noted uncertainties related to the cost savings from removing the 2015 Rule's requirement that operators must run a cement evaluation log.  *Id*.  Specifically, it recognized that some operators might run a cement evaluation log as a matter of practice, thus obviating any cost savings from the 2017 Rule's removal of that requirement, and other operators may structure their operations to avoid delays while running the log, which would also reduce any cost savings.  *Id*.  The cost analysis also had uncertainties because BLM was estimating the frequency with which operators

would voluntarily use tanks, instead of storage pits. *Id.* Finally, the 2015 Rule had a variance provision, but the 2015 Rule never went into effect, which means that BLM had to estimate—in calculating cost savings from the 2017 Rule—the frequency with which BLM would have applied the 2015 Rule's variance provision. *Id.*

BLM promulgated the 2015 Rule "with the intention of improving public awareness and strengthening oversight of hydraulic fracturing operations." 80 Fed. Reg. 16,130. In 2017, it decided to prioritize minimizing regulatory burdens instead. 82 Fed. Reg. 61,926. "[T]he agency must show that there are good reasons for the new policy. But it need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *Fox Television Stations, Inc.*, 556 U.S. at 515–16. BLM had good reasons for the 2017 Rule; Plaintiffs may dislike those reasons, but their displeasure does not invalidate the 2017 Rule and their claims in these cases must be denied.

### C. BLM Considered a Range of Alternatives

California faults BLM for not considering a range of alternatives, but this argument fails for several reasons. Cal. Mot. at 20. Most fundamentally, while California contends that BLM must consider alternatives that "narrowly address" the agency's concerns before rescinding a regulation, *id.*, the APA has no such requirement. BLM "was required to consider the evidence and give reasons for [its] chosen course of action. [It] did so. It is not for [courts] to ask whether [its] decision was 'the best one possible' or even whether it was 'better than the alternatives.'" *Dep't of Commerce*, 139 S. Ct. at 2571 (quoting *FERC* v. *Electric Power Supply Assn.*, 136 S. Ct. 760, 782 (2016) (slip op., at 30)).

In any event, BLM did consider a range of alternatives. BLM explained that the purpose of the proposed action was to reduce and eliminate unnecessary regulatory requirements. HFRR_000150. BLM examined four alternatives in depth: not rescinding the 2015 Rule (no action); rescinding the 2015 Rule (proposed action); rescinding the 2015 Rule and amending the previous regulations to remove the requirement for operators to obtain approval of non-routine

hydraulic fracturing operations (preferred alternative); and rescinding the 2015 Rule except for the chemical disclosure requirements.  HFRR_000144.  BLM selected the preferred alternative. HFRR_000189.

BLM also considered—but decided not to conduct a detailed analysis of—(1) an alternative that would keep the 2015 Rule's requirement for operators to notify BLM before conducting hydraulic fracturing operations and provide detailed information about their plans and (2) an alternative requiring operators to provide notice before fracturing without specifying any particular information that they must provide.  HFRR_000153.  BLM decided not to consider these alternatives in depth because the detailed information would be burdensome for operators to provide and requiring notification without detailed information would not provide any benefits.  HFRR_000154.  BLM also concluded that other alternatives that would retain or strengthen other provisions of the 2015 Rule did not meet its purpose and need of reducing regulatory burdens and therefore did not warrant detailed consideration.  *Id.*

California may dislike BLM's chosen alternative, but that does not invalidate BLM's decision.  *See Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008) ("The court is not empowered to substitute its judgment for that of the agency."  (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971))).

## VI.   NEPA Does Not Apply to the 2017 Rule, But BLM Satisfied NEPA Anyway

NEPA does not apply to the 2017 Rule, but BLM satisfied NEPA anyway when it promulgated the 2017 Rule.  NEPA serves the dual purpose of informing agency decisionmakers of the environmental effects of proposed major federal actions and ensuring that relevant information is made available to the public.  42 U.S.C. § 4321; 40 C.F.R. § 1501.1; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  The statute imposes procedural rather than substantive requirements.  *Robertson*, 490 U.S. at 351 (NEPA "prohibits uninformed—rather than unwise—agency action.").  Thus, NEPA does not require an agency to follow the most environmentally sound course of action, but rather to take a "hard look" at the environmental consequences of proposed actions.  *Id.* at 350.  "A court must avoid passing

1   judgment on the substance of an agency's decision"; instead, its "focus must be on ensuring that

2   agencies took a 'hard look' at the environmental consequences of their decisions." *Westlands*

3   *Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004) (quoting *Robertson*, 490

4   U.S. at 350).

5        As an initial matter, BLM had no obligation to conduct a NEPA analysis because the

6   2017 Rule rescinded a rule that had never gone into effect, which means that it did not change

7   the status quo.  "NEPA procedures do not apply to federal actions that maintain the

8   environmental status quo."  *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1114 (9th Cir.

9   2002), *abrogated on other grounds by Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173 (9th

10  Cir. 2011); *see also Burbank Anti-Noise Grp. v. Goldschmidt*, 623 F.2d 115, 116 (9th Cir. 1980).

11       Even if BLM was required to perform a NEPA review, it satisfied NEPA's requirements.

12  BLM prepared an Environmental Assessment to examine the environmental impacts that may

13  occur from promulgating the 2017 Rule.  HFRR_000140.  The 2017 Rule did not authorize any

14  particular operations on federal or Indian lands, and BLM's NEPA analysis, therefore, did not

15  analyze site-specific impacts of particular operations.  HFRR_000145.  In the nationwide

16  rulemaking context, "[t]here is nothing in the statute or CEQ Regulations that requires an agency

17  to include a site-specific analysis for every particular area affected by the proposed action."

18  *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1255 (10th Cir. 2011).

19

20       BLM estimated that the 2017 Rule would impact 2,800 hydraulic fracturing operations

21  that presently occur annually on federal and Indian lands, but, in the future, there would be up to

22  3,500 operations per year on federal and Indian lands.  HFRR_000165.  BLM determined that

23  the 2017 Rule would have no impact on the number of future hydraulic fracturing operations.  *Id*.

24  It therefore concluded that the environmental impacts of promulgating the 2017 Rule were not

25  significant, and it issued a Finding of No Significant Impact.  HRFF_000194.

26       Plaintiffs argue that BLM failed to take a "hard look" at the 2017 Rule's impacts, but

27  they are wrong.  *E.g.*, Sierra Club Mot. at 31, Cal. Mot. at 25.  To the contrary, BLM did take a

28  hard look at the 2017 Rule's impacts, notably examining several issues, including impacts on

1    water quality and quantity, storage tanks versus pits, and environmental justice.

2                    **A.   BLM Analyzed Water Quality and Quantity Impacts**

3            BLM adequately assessed the 2017 Rule's impacts on water quality and quantity,

4    including by reviewing reports from the Environmental Protection Agency and the National

5    Academy of Sciences regarding water contamination from hydraulic fracturing.  HFRR_000159–

6    60.

7            BLM noted several possible contamination mechanisms.  Environmental impacts are

8    likely when spills occur and chemicals reach groundwater; when operators inject fracturing

9    fluids into wells with inadequate casing or mechanical integrity, thus allowing chemicals to

10   move into groundwater; when operators inject fracturing fluids directly into groundwater; when

11   operators discharge inadequately treated fracturing wastewater into surface waters; and when

12   operators store fracturing fluids in unlined pits that allow chemicals to leach into groundwater.

13   HFRR_000159, HFRR_000161, HFRR_000172.  But BLM determined that such incidents are

14   rare.  HFRR_000159.

15           BLM also recognized and disclosed that releases could occur from tanks, haul trucks, and

16   pipelines, HFRR_000172; that spills can occur as a result of human error (improper equipment

17   handling or installation) or equipment failure (broken pipes or torn pit liners), *id*; and that spills

18   could result from a blowout, i.e., a pressure control failure that can spill tens of thousands of

19   gallons of fluid, HFRR_000173.  BLM noted that, when such large spills occur—on the order of

20   several thousand gallons—containment and recovery measures typically capture less than half

21   the fluid.  *Id*.  But BLM concluded that blowouts are also rare, with a rate of approximately one

22   for every 1,000 drilling operations.  HFRR_078908–34.

23           Another contamination possibility is that, by creating fractures in shale formations,

24   operators can allow gas to migrate through the fractures into shallow aquifers.  HFRR_000160.

25   That scenario is also rare because of the distance between shale formations and shallow aquifers

26   and because of the high pressures in shale formations.  *Id*.  Contamination via leaky well casings

1   is also a possible, but BLM only identified one such incident since 2011.  *Id.*

2        Another possible contamination scenario, a frack hit, is when operators drill one well into

3   another well, causing unexpected pressure increases and possible spills.  HFRR_000161.  Frack

4   hits have been reported in New Mexico and Oklahoma and typically occur when wells are less

5   than 1,100 feet apart, but they have occurred at wells up to 8,422 feet apart.  *Id.*  BLM examined

6   some frack hits in depth, including a 2012 hit in New Mexico that caused a spill of 9,000 gallons

7   of oil; a 2012 hit in New Mexico that caused 60 barrels of fracturing fluids to spill into a pasture;

8   and a 2013 hit in Colorado that spilled 200 barrels of produced water, although none of the fluid

9   reached the Colorado River.  HFRR_000162.  BLM has not received any reports of frack hits

10  since promulgating the 2015 Rule, even though that rule never went into effect.  HFRR_000173.

11        Contamination incidents are rare because operators use multiple safeguards to avoid

12  releasing hazardous wastes.  HFRR_000172.  They design wells with multiple barriers, i.e.,

13  casing, cement, and subsurface rock formations, to prevent fluid movement between oil/gas

14  zones and drinking water resources.  HFRR_076399.  BLM concluded that there are risks to

15  drinking water from fracturing operations, but contamination events are rare.  HFRR_000173.

16

17        As part of its examination of water contamination pathways, BLM reviewed incident

18  reports from federal and Indian wells since December 2014 and concluded that resource damage

19  is unlikely to increase from rescinding the 2015 Rule because of the rarity of adverse

20  environmental impacts from hydraulic fracturing operations.  82 Fed. Reg. 61,931.  BLM is

21  aware of only one report of a well that suffered a failure that the 2015 Rule could have mitigated,

22  but not prevented.  HFRR_000173.

23        Sierra Club challenges BLM's conclusion that accidents are rare.  Sierra Club Mot. at 13.

24  But Sierra Club misinterprets BLM's "Major Undesirable Events" data table, which tracks

25  incidents involving oil spills, gas discharges, salt-water spills, well blowouts, fatalities, and other

26  uncontrolled events.  HFRR_078908–34.  Most of the events on that list are incidents at

27  production facilities or pipelines or drilling incidents—not hydraulic fracturing operations—and

28  thus the 2015 Rule would not have prevented them.  In addition, the numbers on this list are

inflated because each incident can have multiple entries, such as a 2013 incident in Carlsbad, New Mexico, which appears four times because the incident has entries for oil discharged, oil recovered, water discharged, and water recovered.  HFRR_078919.  Sierra Club's faulty interpretation of this data illustrates why courts must treat BLM's conclusion regarding the rarity of accidents with "great deference"—because the Court is "reviewing the agency's technical analysis and judgments," based on an evaluation of complex scientific, engineering, and industry data "within the agency's technical expertise."  *Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 869 (9th Cir. 2003).

In addition to examining the possibility of contamination, BLM also examined potential impacts on water quantity.  BLM noted the potential for severe impacts from water withdrawals, especially in areas with limited groundwater.  HFRR_000159.  Water use from hydraulic fracturing can stress surface and groundwater supplies since fracturing uses a range between 80,000 gallons of water per well in California and 5.3 million gallons per well in Arkansas. HFRR_000162.  Five percent of fracturing operations between 2008 and 2014 reused fracturing wastewater, but reuse is increasing, as evidenced by the fact that operators in the Marcellus Shale in Pennsylvania reused 90 percent of fracturing wastewater.  *Id.*  In most areas, fracturing operations did not stress water supplies, while only in a few cases, water wells went dry after operators completed nearby fracturing operations.  HFRR_000163.  California criticizes BLM because the 2015 Rule required operators to disclose the source of the water they were using for fracturing operations, and the 2017 Rule removed that requirement.  Cal. Mot. at 16.  But BLM acknowledged this difference, which is all that NEPA requires, and, regardless of whether the 2015 Rule is in place, BLM can obtain that information during the APD process. HFRR_000163, 80 Fed. Reg. 61,928.

### B.  BLM Weighed Storage Tanks Versus Pits

Contrary to Sierra Club's argument, BLM particularly analyzed the impact of removing the 2015 Rule's requirement that operators store fluids (either those used in fracturing operations

1    or water that flows back up a well) in rigid tanks, as opposed to above-ground pits.  Sierra Club

2    Mot. at 32.  BLM also carefully considered its prior analysis from 2015 regarding the tank

3    requirement.  HFRR_034669–71.

4         BLM concluded that the 2017 Rule would reduce the frequency (by zero to 100%,

5    depending on the state) with which operators stored fluids in tanks and, as a result, there was an

6    incremental potential for adverse impacts.  HFRR_034650–51.  In Montana, for example, BLM

7    has observed operators using earthen pits that lacked leak detection systems.  HFRR_034669.

8    BLM concluded that removing the tank requirement could cause adverse impacts by increasing

9    the risk of spills and contamination and make it more difficult to detect and remediate leaks.

10   HFRR_034651, HFRR_000190.  Conversely, removing that requirement would reduce

11   transportation-related impacts and make it easier for operators to reuse recovered fluids.

12   HFRR_034651.

13        Overall, BLM estimated that, even without the 2015 Rule, 90 to 94 percent of hydraulic

14   fracturing operations on federal and Indian lands used tanks.  HFRR_000170.  BLM noted that

15   five of the nine states that have the most hydraulic fracturing on federal and Indian lands require

16   operators to use tanks.  HFRR_034651.  Field personnel observed that rigid storage tanks are

17   prevalent in certain areas.  *Id*.  In other words, because of existing state regulations and voluntary

18   compliance, the 2015 Rule would not have had any impact on tank usage in California, New

19   Mexico, North Dakota, Texas, Alaska, South Dakota, and Utah, and would have impacted other

20   states ranging from a low of 7.7 percent of operations in Wyoming to a high of 100 percent of

21   operations in Nevada.  HFRR_034650–51.  BLM expected that operators would use tanks

22   voluntarily when tanks would cost the same or less than pits, and the comparative costs of the

23   two methods depend largely on the volume of recovered fluids.  HFRR_034672,

24   HFRR_034674–75.

25        BLM acknowledged that using tanks would reduce the amount of air emissions, including

26   volatile organic compounds that pits can emit into the atmosphere.  HFRR_000170.  But it

27   explained that this reduction from the 2015 Rule would have been minor because the 2015 Rule

28

did not require tanks to have vapor recovery systems.  *Id.*

Removing the tank requirement would save operators an average of $74,000, and BLM prioritized those cost savings after considering the impacts of removing the requirement. HFRR_034651.  That is all NEPA requires.  NEPA "does not mandate particular substantive results, but instead imposes only procedural requirements," requiring a "reasonably thorough" discussion of environmental consequences.  *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 523 (9th Cir. 1994).  BLM satisfied this standard.

### C.  BLM Considered Environmental Justice Impacts

Sierra Club wrongly asserts that BLM failed to consider the 2017 Rule's impacts on tribal lands.  Sierra Club Mot. at 34.  BLM acknowledged that oil and gas activity on Indian lands was growing.  HFRR_000165.  But it concluded that, because operators are already complying with many of the 2015 Rule's requirements as part of industry practice or other regulatory requirements, the 2017 Rule would not have a disproportionately high impact on minority and low-income populations.  HFRR_000180.  This analysis was sufficient.  For a "'broad' nationwide rule, the [agency] is permitted . . . to evaluate the common environmental impacts and effects of the rule 'generically.'"  *U.S. Dep't of Agric.*, 661 F.3d at 1256 (citing 40 C.F.R. § 1502.4(c)(2)).

### D.  BLM Had No Obligation to Prepare an EIS

Sierra Club erroneously contends that BLM violated NEPA by failing to prepare an EIS. Sierra Club Mot. at 36.  "When an agency takes major federal action, the agency must prepare an EIS 'where there are substantial questions about whether a project may cause significant degradation of the human environment.'"  *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Dep't of Interior*, 996 F. Supp. 2d 887, 896 (E.D. Cal. 2014) (quoting *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005)).  BLM appropriately concluded that the 2017 Rule did not require an EIS.  BLM did not prepare an EIS when it promulgated the 2015 Rule, 80 Fed. Reg. 16,216; the 2017 Rule does not authorize any on-the-ground actions; and the

1    2017 Rule did not alter the status quo since the 2015 Rule never went into effect.  BLM did

2    consider that there may be some adverse effects from the 2017 Rule, but "it does not follow that

3    the presence of some negative effects necessarily rises to the level of demonstrating a significant

4    effect on the environment" that requires an EIS.  *Native Ecosystems Council*, 428 F.3d at 1240.

5    **VII.    BLM Rationally Determined that Its 2017 Rule Does Not Affect ESA-Listed Species**

6           **or Critical Habitat**

7           Even if the ESA challenge could proceed, it would fail on the merits.  Sierra Club alleges

8    that, under Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), BLM should have consulted with

9    the Services before issuing the 2018 Rule.  Sierra Club Mot. at 17.

10          The ESA, 16 U.S.C. §§ 1531-1599, "seeks to protect species of animals against threats to

11   their continuing existence caused by man."  *Lujan*, 504 U.S. at 558 (1992). The ESA does not

12   protect *all* fish wildlife species: instead, it provides legal protections for only for species listed

13   under the Act and their habitats. 16 U.S.C. § 1532(6), (20); *id.* § 1533(a).  Once a species is

14   listed, Section 7(a)(2) of the ESA requires each federal agency ("action agency") to ensure, in

15   consultation with FWS and/or NMFS that any action authorized, funded, or carried out by the

16   agency "is not likely to jeopardize the continued existence" of an endangered or threatened

17   species, or "result in the destruction or adverse modification of [critical] habitat of such species."

18   16 U.S.C. § 1536(a)(2).  Section 7(a)(2)'s provisions are triggered by discretionary and

19   affirmative agency action that "may affect" ESA-listed species. 50 C.F.R. §§ 402.03, 402.14(a);

20   *Karuk Tribe* (en banc).

21          To trigger the ESA's consultation obligation, there must be an affirmative, discretionary

22   agency action which is the *cause* of an effect to listed species or critical habitat.  50 C.F.R. §

23   402.14(a).  *See also* 50 C.F.R. § 402.02 ("effects of the action" includes direct effects and

24   "indirect effects . . . that are *caused by* the proposed action . . ." (emphasis added)).  If the agency

25   determines that a particular action will have no effect on an endangered or threatened species, the

26   consultation requirements are not triggered.  *Sw. Ctr. for Biological Diversity v. U.S. Forest*

27   *Serv.*, 100 F.3d 1443, 1447–48 (9th Cir. 1996).

1    Under Section 7(a)(2), the action agency—here, BLM—must make an initial

2    determination of whether its proposed action may affect listed species or critical habitat.  50

3    C.F.R. § 402.14(a).  If the action will have "no effect" on listed species, the consultation is not

4    required.  *Sw Ctr. for Biological Diversity*, 100 F.3d at 1447–48 (("no effect" finding "obviates

5    the need for formal consultation under the ESA"); *Ground Zero Ctr. for Non-Violent Action*, 383

6    F.3d at 1092 (the action agency need not consult if "the likelihood of jeopardy is too remote").

7    If the action agency determines its action may affect a listed species, it may satisfy its

8    Section 7 obligations through either formal or informal consultation.  50 C.F.R. § 402.14(b).

9    Informal consultation ends either in a finding that formal consultation is necessary, or

10   concurrence by the consulting agency that "the action is not likely to adversely affect listed

11   species or critical habitat," in which case "no further action is necessary."  *Id.* § 402.13(a).

12   Formal consultation is initiated by a written request that includes "[a] description of the action to

13   be considered."  *Id.* § 402.14(c)(1).  It generally concludes in a biological opinion issued by the

14   consulting agency, *see id.* § 402.14(l), which assesses "whether . . . the action is likely to

15   jeopardize the continued existence of a listed species or result in the destruction or adverse

16   modification of critical habitat," *id.* § 402.14(h)(3).  Following issuance of a biological opinion,

17   the action agency determines whether and in what manner to proceed with the action.  50 C.F.R.

18   § 402.15(a).

19

20   BLM determined that the 2017 Rule would not affect ESA-listed species or critical

21   habitat because "[n]either the rescinding nor the implementation of the 2015 final rule would, by

22   themselves, authorize or prohibit hydraulic fracturing operations as a whole, or any particular

23   operation on Federal or Indian lands . . . . [T]hese actions are also not expected to impact the

24   number of hydraulic fracturing operations.  As such, the actions would not, by themselves, have

25   an effect on any listed species or its habitat . . . ."  82 Fed. Reg. 61,941.  This is consistent with

26   BLM's longstanding position: it did not consult with FWS on the 2015 Rule, or on the initial

27   1988 regulation of hydraulic fracturing.  DOIAR0100131.

28   BLM was not, as Plaintiffs suggest, deferring its ESA compliance until later.  Sierra Club

Mot. at 31.  Indeed, in this case, the compliance measures were already in place through measures independent of the 2017 Rule, which only maintained the on-the-ground status quo that had existed since the 1980s because the 2015 Rule never went into effect.  *See* 82 Fed. Reg. at 61,926.  While the preamble to the 2017 Rule does explain to commenters that BLM continues to consider the cumulative and site-specific effects as it makes regional and site-specific determinations, 82 Fed. Reg. at 61,941, those additional protections do not change the fact that BLM already had an "extensive process in place to ensure that operators conduct oil and gas operations in a safe and environmentally sound manner that protects resources" independent of the 2015 or 2017 Rules.  82 Fed. Reg. at 61,926.

In addition, under FWS regulations, biological assessments ("BA") are not required in every action.  Instead, they are only required for major construction activities.  50 C.F.R. § 402.12(b).  That condition is not met here as BLM found in the EA that the 2017 Rule would not have such an impact.  See HFRR_000194.  Moreover, a BA's purpose is to evaluate the "potential effects of an action" on listed species and habitat.  Here, BLM analyzed the effects of the rule on species and concluded that they would have no effect.  Thus, there is no missing analysis.  Plaintiffs simply disagree with the determination made, but bare disagreement is not sufficient to overturn agency action under the APA.

The statement by Mr. Tichenor that it "[l]ooks like we'll need to do a biological assessment for this rule," Sierra Club Mot. at 28 (citing HFRR_2202), does not change this result.  While it is understandably confusing from the cited email thread, Mr. Tichenor was requesting information about states listed in the 2017 Rule in order to cross-reference it for another BLM rule he was working on at the same time.  His statement that a BA would be needed was in reference to the other rule.  *See* Ex. B, Tichenor Decl. regarding email.  Even if Mr. Tichenor's statement had been about the 2017 Rule, the preliminary assessment of one BLM employee does not represent the final view of the agency regarding whether consultation or a BA would be required for the 2017 Rule.  *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658–59, (2007).  Here, BLM performed the appropriate inquiry and rationally

1    concluded that the 2017 Rule did not affect ESA listed species or critical habitat.  Nothing more

2    is required.  Because the ESA consultation obligation does not apply, Plaintiffs' ESA challenge

3    fails on the merits.

4    ## VIII.    ESA Claims Are Limited to Record Review

5            In support of its ESA claims, Sierra Club cites to a number of documents from outside of

6    the Administrative Record.  *See* Sierra Club Mot. at 28–30; Ex C to Sierra Club Mot., ECF No.

7    110-3.  The Court should not consider these materials because ESA claims are properly limited

8    to record review.

9            Congress requires agency action to be reviewed pursuant to the standard and scope of

10   review established in the APA, unless another statute expressly provides a different standard and

11   scope of review.  5 U.S.C. § 559; *see also United States v. Carlo Bianchi & Co.*, 373 U.S. 709

12   (1963); *Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1193–94 (9th Cir. 2000).

13   The ESA does not provide a separate standard and scope of review, 16 U.S.C. § 1540(g), and so

14   the Court's review follows the APA standard and is limited to the administrative record.  *See*

15   *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc) (a failure

16   to consult claim under the ESA "is a record review case"); *Village of False Pass v. Clark*, 733

17   F.2d 605, 609 (9th Cir. 1984); *San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 601–02.

18           The Ninth Circuit, sitting en banc, has made clear that an ESA citizen-suit claim alleging

19   failure to comply with the consultation provisions in ESA Section 7(a)(2) "is a record review

20   case" governed by the review standards in the APA.  *Karuk Tribe of Cal.*, 681 F.3d at 1017.  The

21   standard and scope of review was "necessary" to the *Karuk* en banc court's decision and

22   therefore not dicta.  *Cf. Bateman v. U.S. Postal Serv.*, 231 F.3d 1220, 1224 (9th Cir. 2000)

23   (failing of parties to cite or discuss the correct legal standard "did not relieve the district court of

24   the duty to apply the correct legal standard . . . ," and the district court erred by applying the

25   wrong standard); *see, e.g., Export Grp. v. Reef Indus.*, 54 F.3d 1466, 1472 (9th Cir. 1995)

26   (adopting Black's Law Dictionary definition of "dictum" as "an observation or remark . . . not

27   necessarily involved in the case or essential to its determination").

28

Although Sierra Club acknowledges that the APA's "arbitrary, capricious . . . or otherwise not in accordance with law" *standard* of review applies to its citizen suit claim, it nonetheless contends that the APA's *scope* of review—requiring judicial review based on a record—does not. That is incorrect. The two concepts are inextricably intertwined: the "arbitrary and capricious" standard of review "[has] consistently been associated with a review limited to the administrative record." *Carlo Bianchi & Co.*, 373 U.S. at 715. In fact, the very text of the APA requires courts to review the administrative record "in making the . . . determinations" that agency action meets the APA's deferential standard of review. 5 U.S.C. § 706. For this reason, the Ninth Circuit has repeatedly confirmed that discovery and *de novo* review are incompatible with the deferential APA standard and that ESA citizen-suit claims, in particular, are reviewed on the basis of the administrative record. Likewise, the D.C. Circuit has recently re-affirmed that APA's record-review standard should apply even when the statute at issue requires the agency to consider the "best scientific information available." *Oceana, Inc. v. Ross*, 920 F.3d 855, 864 (D.C. Cir. 2019); *see also id.* (noting that the court applied this standard to the Fisheries Act at issue there "just as we did in an unrelated matter involving the Endangered Species Act, a statute that similarly mandates use of the best . . . data available." (internal quotations omitted)).

The administrative record provides all of the information that the Court needs, and all the information that the Court is legally permitted to consider, to resolve Plaintiffs' ESA claim.

## IX.   Deliberative Documents Are Not Part of the Record

Plaintiffs cite a number of deliberative documents that are not part of the Administrative Record and should therefore not be considered when evaluating Plaintiffs' claims.[22]  As a

---

[22] The Parties disagree about whether deliberative documents are properly considered part of the record. *See* No. 4:18-cv-000524-HSG, ECF No. 87. Federal Defendants agreed to serve the Parties with the privilege log and deliberative materials to facilitate efficient resolution of record disputes and reserved the right to argue that those documents are not properly part of the administrative record, while Plaintiffs reserved the right to argue that deliberative materials are

general matter, "judicial review of agency action is limited to review of the record on which the administrative decision was based." *Thompson v. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989). The administrative record includes "all documents and materials directly or indirectly considered by agency decision-makers." *Id.* (emphasis omitted). However, deliberative documents reveal the mental processes of agency decision-makers and are therefore not part of the record. It is long settled that agency action should be judged on the basis of the agency's stated reasons for its decision, *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943), and it is "not the function of the court to probe the mental processes" of the agency. *United States v. Morgan (Morgan II)*, 313 U.S. 409, 422 (1941) ("Just as a judge cannot be subjected to such a scrutiny . . . so the integrity of the administrative process must be equally respected."). Accordingly, "[s]uch inquiry into the mental processes of administrative decisionmakers is usually to be avoided." *Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 420.

The D.C. Circuit, the only court of appeals to have squarely addressed the question, has concluded that deliberative materials are outside the scope of APA review and thus are not part of the administrative record. *See San Luis Obispo Mothers for Peace v. NRC*, 789 F.2d 26, 44–45 (D.C. Cir. 1986). The court analogized an agency's deliberations to the deliberative processes of a court and stated that, "[w]ithout the assurance of secrecy, the court could not fully perform its functions." *Id.* The D.C. Circuit has subsequently reiterated that "the actual subjective motivation of agency decisionmakers is immaterial as a matter of law" to APA review. *In re Subpoena Duces Tecum Served on Office of Comptroller of Currency*, 156 F.3d 1279, 1279–80 (D.C. Cir. 1998) (denial of reh'g en banc) (citing, inter alia, *Overton Park*, 401 U.S. at 420; *Camp*, 411 U.S. 138; *Morgan II*, 313 U.S. at 409); *see also Oceana, Inc.* 920 F.3d at 855, 865 (D.C. Cir. 2019) ("predecisional and deliberative documents are not part of the administrative

_____

part of the administrative record. *Id.* The Parties stipulated that Federal Defendants retain the right to challenge any citation to deliberative materials on grounds that they do not form part of the record, and the non-federal Parties retain the right to oppose any such challenge. *Id.* at 3.

1   record").

2         Some district courts within this Circuit have likewise held that internal, deliberative and

3   predecisional materials are outside the scope of administrative review.  *See, e.g., Carlsson v. U.S.*

4   *Citizenship & Immig. Servs.*, No. 2:12-CV-07893-CAS, 2015 WL 1467174, at *7 n.5 (C.D. Cal.

5   Mar. 23, 2015); *California v. U.S. Dep't of Labor*, No. 2:13-CV-02069-KJM, 2014 WL

6   1665290, at *13 (E.D. Cal. Apr. 24, 2014).  The Ninth Circuit has not squarely addressed the

7   issue, but it has suggested that deliberative materials are not properly part of the record for APA

8   review.[23]  *Portland Audubon Society v. Endangered Species Committee*, 984 F.2d 1534 (9th Cir.

9   1993), involved a request for discovery regarding alleged *ex parte* contacts with the agency

10  charged with granting exemptions from ESA requirements.  The Court distinguished the purely

11  internal deliberations at issue in the D.C. Circuit's *Mothers for Peace* case from "allegedly

12  improper ex parte contacts between decisionmakers and outside parties."  984 F.2d at 1549.  In

13  so doing, the Court approvingly cited *Mothers for Peace* in suggesting that the administrative

14  record includes "neither the internal deliberative processes of the agency nor the mental

15  processes of individual agency members."  *Id*.

16        The principle that predecisional, deliberative materials are outside the scope of the

17  administrative record is also reflected in the scope of review of agency action in the courts of

18  appeals.  When an agency decision is subject to direct review, the "record to be filed in the court

19  of appeals . . . shall consist of the order sought to be reviewed or enforced, the findings or report

20  upon which it is based, and the pleadings, evidence, and proceedings before the agency, board,

21  commission, or officer concerned."  21 U.S.C. § 2112(b).  Rule 16 of the Federal Rules of

22  Appellate Procedure defines the administrative record in the same terms.  The advisory

23  

24  _____

25  [23] A majority of a Ninth Circuit panel denied the mandamus petition in *In re United States*,
    holding that the government failed to meet the standards for mandamus in the absence of Ninth
26  Circuit precedent holding that deliberative materials were not part of the administrative record.
27  Order, Case No. 17-71121 (9th Cir. Jan. 26, 2018).  The panel did not reach the substance of the
    scope of the record issue.

28

committee that adopted Rule 16 in 1967 explained in the accompanying note that "[t]he record in agency cases is thus the same as that in appeals from the district court—the original papers, transcripts, and exhibits in the proceeding below."  Fed. R. App. P. 16, Notes of Advisory Committee on Rules (1967).  No one would suggest that the record "in appeals from the district court" includes deliberative materials prepared within the court, such as bench memos and recommendations provided to the presiding judge by his staff, or preliminary drafts of opinions and orders.  The trial record comprises the materials submitted to the court by the parties, the transcripts of the court's proceedings, and the orders issued by the court, not the internal deliberative work product generated within the court's chambers.  As the committee note indicates, the administrative record in agency review cases is subject to the same limitations.

In addition, nothing in the APA compels an agency to include deliberative materials in the record.  It is a fundamental principle of administrative law that a court may "not stray beyond the judicial province . . . to impose upon the agency its own notion of which procedures are 'best' . . . ."  *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Defense Council*, 435 U.S. 519, 549 (1978).  Thus, a court has no authority to compel an agency to place deliberative materials in the administrative record, and should disregard the Plaintiffs' citations to such materials.

## X.    Remedy

The Court should grant Federal Defendants' cross-motion for summary judgment and deny Plaintiffs' motions.  Nonetheless, if the Court rules for Plaintiffs, Federal Defendants request the opportunity to provide separate briefing on remedy.  Even if the Court were to find that the 2017 Rule is unlawful, vacatur should not automatically follow because the Court "is not required to set aside every unlawful agency action."  *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995); *see also Sierra Forest Legacy v. Sherman*, 951 F. Supp. 2d 1100, 1105 (E.D. Cal. 2013) ("It is well established in this Circuit that a Court is not mechanically obligated to vacate an agency decision that it finds invalid.").  Whether agency action should be vacated depends on a two-factor test: (1) "how serious the agency's errors are" and (2) "'the disruptive consequences of an interim change that may itself be changed.'"  *Cal. Cmtys. Against Toxics v.*

1    *EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (quoting *Allied–Signal, Inc. v. NRC*, 988 F.2d 146, 150–

2    51 (D.C. Cir. 1993)).  If the Court rules in Plaintiffs' favor, Federal Defendants respectfully

3    request an opportunity to brief these two factors.[24]

4            Even if the Court rules in Plaintiffs' favor and denies remedy briefing, the Court should

5    restrict the scope of its ruling to the 2017 Rule, i.e., the agency action that is before this Court.

6    *See* Order, ECF No. 77 at 9 (noting that "[t]he issue before this Court" is "the legality of BLM's

7    rescission of the [2015] Rule," and "[t]he question in the Wyoming Action, whether BLM had

8    statutory authority to enact the [2015] Rule, has not been presented to this Court.").  Sierra

9    Club's proposed order suggests that the Court order the 2015 Rule reinstated, but that outcome

10   would be inconsistent with the Court's reasoning in its order denying transfer.  ECF No. 110-4.

11   **XI.    Conclusion**

12           The Court should enter summary judgment in Federal Defendants' favor because

13   Plaintiffs lack standing.  Even if the Court reaches the merits, it should uphold the 2017 Rule

14   because BLM complied with the APA, NEPA, and the ESA.

15

16

17           Respectfully submitted this August 2, 2019.

18                                              LAWRENCE VANDYKE
                                                Deputy Assistant Attorney General
19
                                                 _/s/ Corinne Snow_____
20                                              Environment and Natural Resources Division
                                                United States Department of Justice
21                                              CORINNE SNOW (TX Bar No. 24083883)
                                                REBECCA JAFFE (NC Bar No. 40726)
22                                              601 D St. NW, 3rd Floor
                                                Washington, D.C. 20004
23                                              Tel: (202) 305-0258
                                                Fax: (202) 305-0506
24

25   _____

26   [24] For example, the 2015 Rule had a cascading implementation schedule depending on when
     operators had submitted APDs and begun drilling operations.  80 Fed. Reg. 16,218, 16,577.  All
27   of those deadlines have long passed, and disruption would ensue if there were no corresponding
     implementation schedule now.
28

1

rebecca.jaffe@usdoj.gov

2

corinne.v.snow@usdoj.gov

Counsel for Federal Defendants

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| STATE OF CALIFORNIA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. BUREAU OF LAND<br>MANAGEMENT, et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 4:18-cv-00521-HSG (related)

Case No. 4:18-cv-00524-HSG (related)

|  |  |
|---|---|
| SIERRA CLUB, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DAVID BERNHARDT, et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**[PROPOSED] ORDER GRANTING
FEDERAL DEFENDANTS' CROSS-
MOTION FOR SUMMARY JUDGMENT**

The Court has read and considered the briefing in support of and in opposition to Plaintiffs' Motions for Summary Judgment, movant Intervenor-Defendants' Cross-Motions for Summary Judgment, and Federal Defendants' Cross-Motion for Summary Judgment and has heard and considered the arguments of counsel at the December 5, 2019 hearing.

NOW THEREFORE, good cause appearing, Federal Defendants' Cross-Motion for Summary Judgment is hereby GRANTED.  The Bureau of Land Management within the United States Department of the Interior had good reasons and sufficient support for promulgating the rule titled "Oil and Gas; Hydraulic Fracturing on Federal and Indian Lands; Rescission of a 2015 Rule," 82 Fed. Reg. 61,924 (Dec. 29, 2017), thus satisfying the standard under *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009).  In promulgating this Rule, the Bureau of

1   Land Management complied with the National Environmental Policy Act, the Administrative

2   Procedure Act, the Endangered Species Act, the Indian Mineral Leasing Act, the Mineral

3   Leasing Act, the Indian Mineral Development Act, and the Federal Land Policy Management

4   Act.

5   　　　　The Court enters judgment for Federal Defendants on Plaintiffs' claims under the

6   Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*; the Mineral Leasing Act, 30 U.S.C. § 181

7   *et seq.*; the Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq.*; the Indian

8   Mineral Leasing Act, 25 U.S.C. § 396 *et seq.*, the Indian Mineral Development Act, 25 U.S.C.

9   § 2101 *et seq.*, and the National Environmental Policy Act, 43 U.S.C. § 4321 *et seq.*

10   　　　　IT IS SO ORDERED.

11

12

13   Dated: _____　　　　　_____

14   　　　　　　　　　　　　　　　　　　　　HAYWOOD S. GILLIAM, JR.
　　　　　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28